Reed *v*. Helois Carbide Specialty Co.

PETER B. REED et al.

*v.*

THE HELOIS CARBIDE SPECIALTY COMPANY.

[Filed January 5th, 1903.]

1. A corporation mortgage which is duly executed under the hands of the proper executive officers of the company and attested by its corporate seal, which was delivered to the mortgagees, and for which valuable consideration passed to the company coincidently with its delivery, will not be held to be invalid, because there is no proof that a resolution of the board of directors was passed authorizing and directing the making of the mortgage.

2. A mortgage may be a good security for some component parts of the mortgage money and bad as to the residue of it.

3. The stockholders were indebted to a corporation for the price of shares of its capital stock issued to them; by arrangement between these stockholders and the company, it was agreed that the price they owed for the shares should be by the stockholders expended in the purchase of land for the company's factory site; the price was so expended, one of the two shareholders taking the title to the land in his own name. He subsequently conveyed the land to the company which then gave to the two shareholders a mortgage securing payment to them of the amount of money expended as the price of the stock.—*Held*, the mortgage, so far as it secures to the stockholders the repayment of the price of their shares, is invalid as to creditors of the company, and also as to other stockholders. It is *ultra vires* that a corporation should secure to a shareholder, by mortgage, the payment of moneys paid by him as the price of stock issued to him by the company.

4. A corporation mortgage made in good faith, securing payment of purchase-money of land then conveyed, or of money or other valuable consideration paid to or for the benefit of the company and accepted by it, coincidently with the delivery of the mortgage, is a valid security to the extent that it secures such a presently passing consideration.

5. Such a corporation mortgage is valid to the extent above named, notwithstanding it may have been made in contemplation of the possible insolvency of the company. It is not a fraud and not within the prohibition of section 64 of the Corporation act. *P. L. of 1896 p. 298.*

6. So far as such a mortgage attempts to secure pre-existing debts, owing to the mortgagees by the company, it is within the prohibition of section 64 of the Corporation act, and being given in contemplation of the insolvency of the company, is to that extent invalid.

Reed v. Helois Carbide Specialty Co.

On bill, answer and proofs.

The bill of complaint in this cause is filed by Peter B. Reed and Henry Boice to foreclose a bond and mortgage made to them, dated the 25th day of May, 1898, conditioned for the payment of $14,000 within five years from the date thereof, with interest thereon payable semi-annually, with a special condition that if at any time default should be made in payment of interest for the space of thirty days after any semi-annual payment thereof should fall due, the whole principal debt should, at the option of the said mortgagees, become immediately due and payable. The mortgaged premises consists of tracts of land in the county of Atlantic, and were conveyed to the mortgagor, the Helois Carbide Specialty Company, by the complainant Peter B. Reed, by conveyance bearing even date with the mortgage, and the mortgage also purports to include the buildings, machinery or fixtures then on the mortgaged premises, or thereafter to be placed on said premises, it being agreed that all machinery, fixtures and buildings are real estate. The mortgage was acknowledged on the 27th day of May, 1898, and recorded on the 28th day of May, 1898.

The bill of complaint makes defendants John J. Rochford and others, holders of a mortgage made by the carbide company, to secure the payment of $23,000, dated September 16th, 1898. Also Frank A. Souder, in respect to a judgment recovered by him against the carbide company on mechanics' lien for $4,002.08 on the 3d day of December, 1898. The bill of complaint further alleges that on the 25th day of November, 1898, an installment of interest to the amount of $420 came to be due and remained unpaid for more than thirty days thereafter, and that the complainants, holders of the mortgage, have elected that the whole principal sum of $14,000 should come to be immediately due and payable. The bill prays for payment of the mortgage, or in default thereof, a foreclosure sale.

The defendant company answers the bill, and admits that its officers executed and delivered to complainants the bond and mortgage in the name of the company, but denies that the company owed the mortgage money, or any other sum, and that it

authorized the execution of the bond and mortgage. It admits that it executed and delivered the mortgage for $23,000 to Rochford and others, and that Souder, on December 3d, 1898, recovered and entered the judgment for $4,002.08 set forth in the bill.

The company then, by way of cross-bill, complains that on May 24th, 1898, the complainants were both stockholders, and the complainant Reed was director and treasurer of the company; that they procured the stockholders, at a special meeting held on that date, to pass a resolution directing the president and secretary to execute to them the complainants' bond and mortgage; that immediately after the passage of that resolution Reed resigned as director and treasurer, and on the following day procured the bond and mortgage to be delivered to the complainants; that at the time of the execution and delivery of the bond and mortgage the defendant company was in embarrassed circumstances, and in view of that fact the complainants procured it to be made to them. At the time of the passage of the resolution Reed was the holder of two hundred and five shares of the capital stock of the company, of the par value of $100 per share, which he obtained from the company without any consideration, and for which he was indebted to the company in the sum of $20,500; that the complainant Boice was the holder of fifty shares, of like par value, which he had obtained from the company without consideration, and for which he owed the company $5,000; that to escape the said stock liability the complainants, immediately after the passage of said resolution, assigned their said stock to Elias Wright, as trustee.

That at the time of the making of complainants' mortgage the complainant Reed held title to the mortgaged premises, as trustee for the defendant company, the property having been purchased by him as its agents, with its funds, and he refused to convey this property to the company unless its officers would consent to the making of the complainants' mortgage and to the releasing of the complainants from liability on their said stock by a formal transfer thereof to Wright; that the making of the mortgage and the transfer of the stock were never duly authorized

or sanctioned by the board of directors of the company, and that, at the date of the bond and mortgage, the company was not indebted to the complainants beyond the sum of $3,100.

The defendant company insists that the bond and mortgage are void, and prays that the complainants may be decreed to surrender the same for cancellation.

The defendant Frank A. Souder also answers the bill of complaint. He denies the indebtedness of the defendant company to the complainants, denies that the bond and mortgage of the complainants were authorized to be made by the company, admits the execution of the mortgage of September 16th, 1898, to Rochford and others, denies that any mortgage-money is due to the complainants, and sets up his own judgment on his mechanics' lien, entered December 3d, 1898, as a prior lien to the mortgage of the complainants.

By way of cross-bill the defendant Souder alleges that the complainants subscribed for two hundred and eighteen shares of the capital stock of the company, and on that subscription were indebted to the company in the sum of $21,800; that the complainants, before the making of the mortgage, purchased the mortgaged premises, and paid for it with part of the money due on their subscription for the capital stock, and took title thereto in the name of the complainant Reed, but the defendant Souder insists that it was, in fact, purchased with the moneys of the carbide company, and was held in trust for it by the complainant Reed; that the complainants had also advanced about $3,100 on account of the company, and when the latter demanded that the title of the mortgaged premises should be conveyed to it, Reed refused to convey unless the company would give the complainants a mortgage for $14,000 to cover the moneys Reed had paid on account of his subscription to the capital stock of the company; that the matter was determined at a meeting of the board of directors, held May 21st, 1898, at which Reed was present, and, through his influence and vote in the board, a resolution was passed to execute and deliver to complainants the $14,000 mortgage held by them and to take back the two hundred and eighteen shares of the stock of the company for which Reed had

subscribed. The cross-bill further alleges that at that time the defendant Souder was a creditor of the company, for labor performed and material furnished in the construction of a building on the mortgaged premises, that the company was in an insolvent ,condition, which was known to the complainant Reed; that Reed agreed with the company and with the defendant Souder that he would assume the indebtedness of the company to the defendant Souder. The defendant Souder charges that the complainants' bond and mortgage are void as against him, and prays the complainants may be decreed to deliver them up for cancellation, and that the complainant Reed may be decreed to pay to the defendant Souder the amount of the latter's judgment, with interest and costs.

The complainants in the main suit join issue on the defendants' answers. They also answer the cross-bills, denying the facts therein advanced, and averring that the defendant company at the time of the passage of its resolution authorizing the making of the mortgage was indebted to the complainants in the sum of $12,539.90 for actual cash expended for and in behalf of the company at its request, and that at the time of the execution of the bond and mortgage the complainants advanced to the defendant company the further sum of $1,469.10. They admit that at the time of the making of the mortgage the title to the mortgaged premises was in the name of the complainant Reed, but they deny that he held the same in trust for the defendant company, and that they were purchased by Reed as its agent or with its funds, and that he refused to convey to the company unless its officers would consent to make a mortgage and release the complainants from their liability on the stock, and they further deny that the mortgage and transfer of stock was not duly authorized by the board. They deny that the company was not indebted to the complainants at the date of the bond and mortgage beyond the sum of $3,100, and aver the fact to be that it was indebted to the complainants at that time in the sum of $14,000 actual cash paid to or for the defendant company at its request.

On these pleadings the cause came to a hearing.

*Mr. George A. Bourgeois,* for the complainants.

*Mr. William I. Garrison* and *Mr. Thomas E. French,* for the defendant Frank A. Souder.

*Mr. David J. Pancoast,* for the defendant the Helois Carbide Specialty Company.

GREY, V. C.

This is a foreclosure case. The complainants' mortgage is disputed by the mortgagor company and by Frank A. Souder (a creditor of the mortgagor company), who holds a mechanics' lien judgment against that company, entered subsequently to the making and recording of the complainants' mortgage.

The testimony in this cause covers a much wider scope than is necessary to settle the questions raised by the pleadings. The only matters which, on this foreclosure suit, may pertinently be determined are the validity of the complainants' mortgage, the amount due thereon, if it be found valid, and whether it is a prior lien to the judgment of the defendant Souder; and on the cross-bill of that defendant, whether decree should be made that the complainant Reed should pay to the defendant Souder the balance remaining due on his judgment.

All questions which have been contested and discussed on the argument touching the liability of the complainants as stockholders of the defendant company, or the ultimate adjustment of equities attending the issue of holding or surrender of the stock of the defendant company, must be considered and determined in some suit in which these matters may be properly in issue. They have no place in the present foreclosure proceedings, except the incidents attendant upon the application of the purchase-money of stock to the purchaser of land, and the subsequent inclusion of that purchase-money in the complainants' mortgage. That point is dealt with hereinafter.

Taking up the questions disputable in this cause under the pleadings, the complainants' mortgage, while admitted to have been actually executed with all the requisite formalties, is denied

---

---

to have been made and delivered under any proper authority of the mortgagor company.

The mortgage was authorized to be made by a resolution adopted at a duly-called meeting of the stockholders, which met on the 21st day of May, 1898, pursuant to notice, and was attended by substantially all of the stockholders of the defendant company. The resolution directing the making of the mortgage was affirmatively voted for by all the stockholders there present, excepting Mr. Monroe, the holder of one hundred shares. The objection presently under consideration challenges the validity of the whole mortgage, on the ground that it was not authorized to be made and delivered by the board of directors. The single member who stood out at the stockholders' meeting resisted the authorization of the mortgage because he opposed the securing to Reed and Boice, by mortgage, the moneys paid out by them for the stock of the company. This point will be considered hereafter. As to the non-authorization by the board of directors, it is true that no formal resolution of the board of directors directing the mortgage to be made is shown to have been passed. But it is proven that the meeting of the stockholders which authorized the mortgage was itself called by the board of directors for that purpose, and that the mortgage was, in fact, executed by the executive officers of the company, who were members of the board; that the common seal of the company was under the control of the board, was affixed to the mortgage, and that its execution was proven by the annexed oath of the secretary of the company, which declares, referring to the mortgage,

"that said conveyance was signed, sealed and delivered as and for the voluntary act and deed of the said grantor for the uses and purposes therein expressed, *pursuant to a resolution of the board of directors of said grantor.*"

There is no dispute that the signatures attached to the mortgage are the genuine signatures of the executive officers of the company, or that the seal affixed is its corporate seal. There is no satisfactory negative proof to the effect that the board of directors did not, in fact, authorize the execution and delivery of the mortgage. It is entirely undisputed that part of the con-

sideration of the mortgage was a substantial sum of cash, paid by the mortgagees into the treasury of the company coincidently with the delivery of the mortgage to them. This cash-money mortgage was received and apparently used for the benefit of the company.

Another consideration inducing the making of the mortgage was the securing of part of the purchase-money of the mortgaged lands conveyed to the company coincidently with the giving of the mortgage. This phase of the case is hereinafter discussed in detail. On the point now under discussion—the validity of the mortgage as a corporate act—it is pertinent, for the corporation accepted the conveyance of these lands, subsequently took possession of them, and improved them as its own. These incidents amount to a ratification of the acts of the company's officers in purchasing the land. The giving of the mortgage was an incident in the purchase.

A corporation mortgage coming into existence under such circumstances cannot be challenged because of the mere absence of affirmative proof of the formal action of a board of directors of the company authorizing it to be made. In such cases, in the absence of proof that it was unauthorized, it will be presumed that it was authorized. *In re West Jersey Traction Co., 14 Dick. Ch. Rep. 63,* and cases there cited.

The defendant Souder, who is a creditor of the company, also attacks the mortgage as a whole, upon the ground that it is a fraud, in that it was bargained for and arranged between Captain Reed, a director and officer of the company, and the corporation itself, to secure to him, in contemplation of insolvency, a preference in the payment of debts due to him from the company, and he cites section 64 of the General Corporation act (*P. L. of 1896 p. 298*) in support of this criticism, where it is declared that neither the directors nor any officer or agent of the corporation shall sell, convey or assign or transfer any of its estate, effects, choses in action, goods, rights and credits, lands and tenements in contemplation of insolvency, and that every such sale, &c., shall be utterly void as against creditors.

This criticism, so far as it challenges the mortgage as a whole,

cannot be sustained if there be any portion of the mortgage-money lawfully secured by it. A mortgage may be good for some component parts of the mortgage-money and bad as to the residue. In *Savage* v. *Miller, 11 Dick. Ch. Rep. 437,* the court of appeals held a mortgage given to secure several distinct items of indebtedness to be valid as to some of them and invalid as to others. In the present case a part of the mortgage debt accrued for cash actually delivered by the mortgagees to the mortgagor company at the time the mortgage was given. The mortgage secures the payment of this money, and to this extent at least was not given to secure the payment of a pre-existing debt, which is the sort of debt referred to by the above-recited statute.

The mortgage cannot be invalidated as a whole because of any of the attacks made upon it. It remains to consider the defendant's contentions which challenge the amount of money which the mortgage secures.

The complainants insist that it is a purchase-money mortgage, securing the price of land coincidently conveyed for a large part of its total amount; that another part secures the payment of moneys precedently advanced to enable the company's business to be carried on, and that the residue—$1,469.10—was cash paid by the mortgagees to the mortgagor on the delivery of the mortgage. The complainants contend that the mortgage is a valid security for the whole amount expressed on its face. The ascertainment of the true sum due on the mortgage requires some examination into the relations of the parties which resulted in the creation of it.

The Helois Carbide Specialty Company is a corporation organized under the laws of this state in December, 1897. Its business appears to have been the manufacture and sale of a patent lamp, which was thought to be a valuable improvement for the purposes of lighting. Its principal manufacture had been carried on at a factory in Clearfield street, Philadelphia, and it was proposed, in the early part of 1898, to purchase land at some location at or near Absecon or Pleasantville, and there to build new buildings, and remove its factory to that place. The complainants, Reed and Boice (Reed being the most active),

became interested in selecting and securing a site for the location of the company's proposed factory. It was agreed, in February, 1898, between the company and Reed and Boice that Reed should be made treasurer of the company; that one hundred shares of the company's capital stock should be issued to Reed and Boice at $50 per share, and that the $5,000 due the company for this issue should be used in the purchase of a site upon which to locate the company's factory. The one hundred shares of stock was issued on March 1st, 1898, to Reed under this agreement. Reed transferred fifty of them to Boice. Boice paid $2,500 (his portion of the $5,000) to Reed, and the latter proceeded to purchase lands on the site selected. Reed was afterwards, on May 2d, 1898, elected treasurer of the company. No money was paid into the company's treasury for this issue of stock. Reed expended in the purchase of land for the company a very considerably larger sum than the $5,000 due to the company for the stock issued to him and Boice. He took all the titles in his own name, but does not appear to have claimed at any time that he held them for his own benefit; indeed, he admits he bought for the company, upon an understanding that he was to be reimbursed when he turned the land over. The company approved of his purchases, for it located its factory building on the site purchased by him, and proceeded to equip it for the manufacture of its lamps. Between February and April 18th, 1898, Reed had expended in the purchase of lands, for the benefit of the company, a total sum of over $7,000. On this last date—April 18th, 1898—two hundred and fifty additional shares of the capital stock of the company were issued to Reed, and it is contended by the defendant company and Souder that these shares were also issued upon an understanding that the purchase-money due the company for the stock should be applied or credited to the land purchased, made by Reed for the company, and for building to be paid for by him. It may be said here and now that there is no sufficient evidence to prove that there was any agreement between Reed and Boice, or either of them, and the company to the effect that the purchase-money of any stock issued to them, or either of them, by the company, other

than the first one hundred shares, should be applied in the purchase of land. Between April 18th, 1898, and May 9th of the same year disagreements arose between Mr. Reed and the other directors of the company. On May 9th, 1898, the board of directors had a conference with Captain Reed, and arranged with him that a meeting of the stockholders should be called to authorize the giving of a mortgage to him. The amount for which the mortgage was to be made was first spoken of as $16,000, which was understood to include the sum of $3,500, or thereabouts, of cash yet to be advanced by Captain Reed. A notice was given for the stockholders' meeting on May 21st, 1898, and, pursuant to the notice, a meeting was held and passed a resolution in these words:

"On motion of Gen. Wright, seconded by F. A. Souder, the president and secretary of the board were authorized and instructed to execute a mortgage for $14,000 upon property of the company located in the borough of Pleasantville, town of Absecon and township of Egg Harbor, to Peter B. Reed et al., for money advanced and to be advanced to the company by him."

When the mortgage came finally to be executed it was arranged between the parties that its total sum should be $14,000, a portion of which should be cash to be advanced by Captain Reed upon the delivery of the mortgage.

Under the above resolution the mortgage of the complainants was made and delivered. It is dated the 25th day of May, 1898; proved May 27th, 1898, by the oath of A. W. Bailey, secretary of the company, and was recorded on May 28th, 1898, in Atlantic county clerk's office. It is admitted that one of the objects of giving this mortgage was to enable Captain Reed and Mr. Boice to "go out" of the company in every capacity in which they were related to it, except the holding of ten shares each as stockholders. Under this arrangement Captain Reed resigned the treasurership of the company and also from its board of directors, and surrendered to the company all of the shares of stock held by him, except ten shares retained by him. Ten shares were also retained by Mr. Boice. These were the circumstances under which the complainants' mortgage came into

16

existence. Immediately thereafter the complainant Reed ceased to make any advances to carry on the corporation's business, and it was thrown upon its own resources. The gentlemen who were then connected with it were obliged, from time to time, to make advances to the extent of over $23,000 to aid the company in carrying on its business. The struggle for life continued until November, 1898, when it appears to have been abandoned. Shortly after that the defendant Souder recovered judgment, the company ceased all business and it was openly confessed that the corporation was insolvent.

The statutory prohibition against the transfer of assets of corporations which are insolvent, or in contemplation of their insolvency, first appears in the statute of 1829. *P. L. of 1829 p. 58 § 2.* It is entitled "An act to prevent frauds by incorporated companies." It continued to be part of the statutory laws of this state until the revision of the year 1875. In the revision of that year this provision was omitted, but was re-enacted on the 5th of March, 1895. *P. L. of 1895 p. 166.* It is now part of the General Corporation act of 1896. *P. L. of 1896 p. 298 § 64.* A large number of cases, which are quite instructive upon the general principles of the law applicable to the erecting of preferences by officers of corporations, arose during the period between 1875 and 1895, while this prohibition was off the statute-book. A list of them may be found in the case of *Savage* v. *Miller, 11 Dick. Ch. Rep. 438:* That case itself arose upon a mortgage which was created before the act of 1895 re-enacted this prohibition. The mortgage presently under consideration is operated upon by the prohibition, and the question as to the amount which it might rightfully secure must be determined with relation to it.

The prohibition is against transfers of the corporation's property in contemplation of its insolvency. I do not understand this prohibition to be applicable to conveyances made in good faith by the officers of a corporation at a time when the financial embarrassments of the company are such that its insolvency may be within contemplation, if, as incidental to, and essentially a part of, the conveyance made, a present consideration moves to

the company. For instance, if a mortgage be given to secure the payment of money paid in good faith to the company coincidently with the delivery of the mortgage; or a purchase-money mortgage be given to secure the payment of the purchase-money of land conveyed to the company coincidently with the making of the mortgage; or if property be in good faith transferred to the company, and its property, or money, be given in exchange therefor. In all such cases the value of the assets of the company is not materially changed. It is as solvent after such a transaction as it was before.

In all business enterprises which are threatened with financial embarrassment, insolvency is necessarily within contemplation. It is very rarely, indeed, that the financial situation of a corporation is so perfectly defined that it continues solvent up to a given instant, and is immediately thereafter insolvent. In almost all such cases there is a period of struggle, during which efforts are made to rescue the enterprise from threatened insolvency. These efforts are necessarily taken in contemplation of insolvency. The transfer of the corporation's property, in order to convert it into money, may be the only means of averting the insolvency which is feared, and the capacity legally to make such instant conversion may be absolutely necessary to the financial salvation of the corporation. The officers of the corporation, who are most intimately acquainted with its present embarrassment and future prospects, are naturally the persons who would be most likely to furnish the money necessary to relieve the corporation from its threatened danger. Such transactions, carried out in good faith, for full consideration coincidently passed to the corporation, seem to be a necessity. They are not "frauds by incorporated companies," to prevent which the statute above recited was originally passed. They are in no way detrimental to creditors of the corporation, for they have the same value of assets after such transfers of property as before. Any other construction would compel the immediate winding up of every corporation whose financial affairs should become temporarily embarrassed. It would have no power to pledge assets for present loans, or even to make sales of its property for cash, in order to

meet a·present need for money, which, when met, would cease to be embarrassing, and carry the corporation over to a more favorable period, when all its obligations could readily be discharged.

It is upon this construction of the meaning of the statute that the validity of the complainants' mortgage will be tested.

The first element composing the money secured to be paid by complainants' mortgage is the money claimed to have been spent by the complainants in the purchase of land for the company. The moneys thus spent are divisible into two parts—one portion was expended as the payment·by Boice and Reed for the one hundred shares of the capital stock of the company, issued to and held by them, which they had agreed with the company should be spent for the purchase of land for a site for the company's factory; the other portion spent for the land was disbursed by Captain Reed, without express agreement that it was the purchase-money of stock issued, or to be issued, to him, and was, in fact, a voluntary purchase made by him for the benefit of the company, but taking the title to the land purchased in his own name, thus securing himself for the moneys so by him voluntarily expended, whenever he should convey these lands to the company.

As to the first item, the money paid for land in satisfaction of the debt which Reed and Boice owed to the company for stock which it had issued to them, the mortgage cannot be held rightfully to have secured its repayment. This is true irrespective of the prohibitions of the statute against preferences. The money owing by Reed and Boice to the company for its capital stock was the money of the company. When they spent it, by the company's direction, in the purchase of lands, it was the company's purchase to that extent, no matter in whose name the title might have been taken. If but a single piece of land had been purchased for $5,000 with this money in Captain Reed's name, equity would have compelled him to convey that piece to the company, without further compensation to him. What was done was that Boice and Reed, on making this conveyance, received from the company a mortgage securing the re-

payment to them of the $5,000, which they had owed to the company for its stock, and which they had spent for the company in the purchase of the land.  For this portion of the mortgage-money they gave no consideration whatever, except the surrender of the one hundred shares of stock.  The transaction was that the complainants, being holders of one hundred shares of stock, which they had purchased from the company for $5,000, surrendered it to the company, and received security for the repayment to them of the $5,000.  This course of procedure was in derogation of the rights of the creditors of the company, and also of the rights of all stockholders who had fully paid for the stock issued to them.  *Boney* v. *Williams, 10 Dick. Ch. Rep. 699.*  For this reason the $5,000 part of the complainants' mortgage must be rejected.

The other portion of money expended in the purchase of lands was made by Captain Reed out of his private funds, without specific agreement that it was an application of any money owing by him to the company.  To the extent that he thus voluntarily advanced purchase-money, he was justified in taking the title in his own name to lands purchased, and in requiring from the company, when it accepted and received the title for those lands, that it should repay to him the purchase-money so by him advanced.  Until such moneys were so repaid, or secured to his satisfaction, he might rightfully have retained and refused to convey the title.  For moneys so expended by Captain Reed for lands conveyed to the company coincidently with the mortgage received from the company securing payment of those moneys, the mortgage must be held to be good.  To that extent the mortgage does not, in any proper sense, transfer the property of the company.  It does not secure the payment of an antecedent debt, but was, and is, a purchase-money mortgage, the means by which the company acquired the property.  The estate of the company received an accession of assets by the conveyance which is equal to the obligation given in payment therefor by the mortgage. Creditors are not harmed, because the accession of assets balances the obligation.

Another component part of the mortgage-money is the sum

of $1,469.10, paid in cash by Captain Reed into the treasury of the company· as the balance to make a net sum of $14,000 at the time he took the mortgage. This was also an accession to the estate of the corporation, and was paid in upon the hope and expectation that it might relieve the company from its financial embarrassments. I do not understand that the statute prohibits a corporation which is in financial embarrassment from borrowing money or purchasing property in good faith, in the hope and expectation of relieving itself from threatened trouble, and conveying property or giving securities and pledges in consideration of such purchases or loans. Such transactions are undertaken and carried on for the very purpose of avoiding insolvency. As above stated, they do not, when conducted in good faith, lessen the assets applicable to the payment of the corporation's debts, and they are necessary and useful aids in the restoration of its financial standing. The moneys paid in cash into the treasury of the company by Captain Reed on the delivery of the mortgage are rightfully secured by it.

Another portion of the mortgage-money secured the advances which Captain Reed had, before the giving of the mortgage, made, from time to time, out of his own pocket to aid the company in the carrying on of its business. The company was indebted to him on the day when the mortgage was made to the extent that he had theretofore made these advances. These items were totally disconnected from any of the incidents attending upon the purchase of the land. Captain Reed had no right to retain the company's land, which stood in his name, until the prior debts owing to him by the company should be paid or secured. He had expended money for the general benefit of the company. For that expenditure the company owed him an unsecured debt. It was such an indebtedness as an officer of a corporation might not secure to himself by a conveyance of its property in contemplation of its probable insolvency. As to this portion of the mortgage-money, it is, therefore, a proper question whether the mortgage was taken in contemplation of the insolvency of the corporation.

It is contended that Captain Reed was not a director of the

company when the mortgage was made. All the proofs go to show that his resignation was arranged as part of the plan for the giving of the mortgage. He was to "go out" of the company. An officer cannot lawfully arrange to have the debt due him from the company secured to be paid by a transfer of its assets, then resign a few days before the delivery of the prearranged security, and claim that when it was given he was not an officer of the company. Such a transaction is not in good faith, and will not be recognized in a court of equity.

It is also shown that at the time the complainants' mortgage was taken there were outstanding debts owing by the company, notably that of the defendant Souder.

Did the complainants take their mortgage in contemplation of the insolvency of the defendant company?

Before Captain Reed took the mortgage he had become dissatisfied, he says, with the company, because he found it did not, in fact, own a certain patent, which he had been led to believe it did own. He also knew that the company was short of funds to carry on its business, for he had been himself furnishing the money to pay its current expenses. He knew that a very large amount of stock had been issued from the treasury of the company at but fifty cent. of its par value, for he had himself taken a number of shares under such an arrangement. He knew that it was proposed, and at one-time agreed, that he and Boice, Doctor Rochford, the president of the company, and Doctor Bailey, the secretary,

"should take the $25,000 which remained in the treasury at fifty per cent. and sell it to their best advantage and reap the benefits and profit that they could get over and above the fifty per cent. which they paid to the company."

This is Reed's own testimony. Two hundred and fifty shares of the capital stock of the company was actually issued to him under this arrangement. All of these incidents go far to show that, in the latter part of May, 1898, the complainants in this suit contemplated a financial situation for the company which was extremely dangerous to its continued solvency. It was with

this knowledge that the complainants' mortgage was taken, securing, in part, an antecedently existing debt owing from the company to Captain Reed for previous advances made by him to aid the company in carrying on its business. It was a matter of debate as to whether Captain Reed should "go out" of the company and upon what terms, and it was quite clearly shown that his own opinion of the future prospects of the company were such that he refused to convey to the company the title to the land, which he admits he purchased for its benefit, unless upon terms that all of his expenditures of every character in and about its business, whether they were the proper subject of a mortgage or not, should be secured to him by mortgage. His quitting to advance money led directly to the company's failure, and this result was indicated when he took his mortgage.

It must be held that the complainants' mortgage was taken in contemplation of the insolvency of the defendant company, and, so far as it secured the payment of a pre-existing debt, it was an unlawful transfer of its assets, in the nature of a fraud, and therefore invalid.

Questions touching the issue of stock to the complainants, or either of them, and their liability thereon as stockholders, I have not discussed, because they should be presented in a proper cause, which this foreclosure suit is not, save so far as these matters are above considered in their relation to the amount which might rightfully be secured by the mortgage.

The only other question remaining is the alleged priority of the judgment of the defendant Souder to the complainants' mortgage. The judgment is a mechanics' lien judgment. The complainants' mortgage was on record when the suit was begun. Mr. Souder did not make Messrs. Reed and Boice defendants in his lien suit. A memorandum endorsed on the summons shows that he did not, as lien claimant, assert any priority against the complainants.

It is also claimed by Mr. Souder that the complainant Reed agreed to pay for the building for which Souder claimed his lien. This is flatly denied by Reed, and is in no way sufficiently proven. The debt was claimed by Souder himself to be a debt

due him from the defendant company. No promise of Reed, in writing, to pay it is attempted to be proven. No actual promise to Souder by Reed is proven even by parol. The proof is of Reed's declaration to others. No such situation of affairs and agreements of parties are shown as would amount to a novation, whereby Souder exonerated the defendant company in consideration of Reed's promise to pay. The claim of Souder that Reed be decreed to pay his debt, set up in the cross-bill, must be refused.

If counsel can agree as to the totals of the items of money which may properly be included within the complainants' mortgage, as above indicated, a decree may be signed accordingly. If counsel are unable to agree, I will refer this matter to a master, to state an account of those items in accordance with this opinion. The testimony upon these points is somewhat detailed and obscure. The question of costs will be settled on advising final decree.