Miller *v.* Gourley.

RICHARD T. MILLER, receiver, &c.,

*v.*

SAMUEL GOURLEY.

[Filed October 6th, 1903.]

1. A corporation was unable to pay its debts in the usual conduct of its business. Its board of directors passed a resolution directing the creation of a mortgage for $20,000 upon the real and personal property, and authorizing the payment of a commission of ten per cent. for the placing of the mortgage. No intended mortgagee was named in the resolution. The circumstances of the case indicated that the mortgage was intended to raise money to be at the disposal of the company for the payment of its debts. The executive officers of the company made and delivered a mortgage for $20,000 to a person (claiming to be a creditor of the company) selected by them. What items went to make up the $20,000 is, upon the evidence, uncertain. It is shown that at least $14,000 of it consisted of pre-existing debts owing by the company to

the selected mortgagee, and that but a small portion of cash was paid by the mortgagee for the company's benefit at the time of the delivery of the mortgage.—*Held,* the mortgage was made to the mortgagee creditor of the company without authorization from the board of directors, and in contemplation of its insolvency, and is invalid to secure any part of the mortgage-money, except that which was paid to or for the mortgagor company, at the time of its delivery, induced by reliance upon its security.

2. The affidavit of the mortgagee annexed to the mortgage stated the true consideration of the mortgage to be "Twenty Thousand Dollars, two thousand dollars thereof in cash loaned by the mortgagee to the mortgagor, and the balance thereof in work and labor performed by the mortgagee for the mortgagor at its request." The evidence showed that this was not the true consideration of the mortgage.—*Held,* the mortgage is wholly invalid as a chattel mortgage, under the provisions of section 4 of the Chattel Mortgage act. *Gen. Stat. p. 2113.*

On bill, answers and proofs.

This bill is filed by the complainant, as receiver by appointment of this court of Robert S. Hobbs & Company, a corporation of this state, against one Samuel Gourley, the holder of a real estate and chattel mortgage, made on the 13th day of December, 1901, by that company to the defendant, to secure the payment of $20,000, covering substantially the entire property of the company. The affidavit of consideration specifies that the true consideration of the mortgage was $20,000, of which $2,000 was for cash loaned to the mortgagor, and the balance for work and labor performed by the mortgagee for the mortgagor, at its request.

The mortgage was recorded on December 14th, 1901, in Burlington county clerk's office, where the real and personal property of the mortgagor company was situated.

On January 15th, 1902, Samuel Gourley, Jr., the son of the mortgagee, filed his bill in this court alleging that the R. S. Hobbs Company was insolvent, and praying the appointment of a receiver. On the same day the defendant company filed its answer admitting its insolvency, and on the same day Richard T. Miller was appointed receiver. Under that appointment the receiver has brought the present suit, challenging the legality of the mortgage held by Samuel Gourley, the father.

The R. S. Hobbs Company was organized on the 1st day of

Miller *v.* Gourley.

May, 1901, for the manufacture of wall paper. It needed build-ings for its business, and, in the spring of 1901, entered into contracts for the erection, with either Samuel Gourley, Jr., the son of the mortgagee, or with Samuel Gourley, the mortgagee himself, it being one of the points in dispute which of these two parties contracted to erect the buildings.

The complainant charges that the buildings were contracted for and were, in fact, built by Samuel Gourley, Jr.; that at the time the mortgage was given, the mortgagor company was in-solvent; that both Samuel Gourley, Jr., and Samuel Gourley, were aware of this condition of affairs; that the mortgage was made by the officers of the company without any vote of the board of directors of the company that it should be made; that, in fact, no cash sum of money was paid on the making of the mortgage; that it was given to secure for Samuel Gourley, Jr., whatever was due him from the company as a preferred debt, in expectation of the financial failure of the company, and that the mortgage was made for an amount in excess of all that was due from the company to Samuel Gourley, Jr.

The bill charges that the mortgage is fraudulent as against the receiver, representing the creditors of the insolvent com-pany, and prays that it may be decreed to be null and void, and no lien on the property described therein, and that it and the bond of the company accompanying it, may be delivered up to be canceled.

The defendant, Samuel Gourley, by his answer denies that the bond and mortgage were not executed in accordance with the direction of the by-laws of the company and without the approval or direction of its officers. He avers that the defend-ant did advance the sum of $2,000 to the mortgagor company, and that the company was indebted to the defendant, at or prior to the making of the bond and mortgage, in the sum of $18,000 for work and labor done for the company by the de-fendant, and that there is due on the bond and mortgage the sum of $20,000, less a small amount for adjustment of accounts between the parties. He denies that Samuel Gourley, Jr., was the creditor of the corporation, denies that the corporation was insolvent when the mortgage was made, and that he had any

knowledge when the bond and mortgage were executed that the corporation was either insolvent or about to become so; denies that the mortgage was taken to prefer any indebtedness owing to Samuel Gourley, Jr., and that when it was given it was in any way fraudulent or without consideration, and further denies that either the officers of the corporation who executed it, or the defendant had, at the time of its execution, any knowledge that the corporation was insolvent or in contemplation of insolvency.

The answer further states in detail that the defendant contracted for the erection of the mortgagor company's buildings, and did the work and furnished the material required therefor, and considerable extra work, amounting in all to $6,417.66; that after he had nearly completed his contract he learned that the money subscribed for the capital stock of the company had not been paid in, and that the company was without ready funds to pay him. He proposed that the company should give him a mortgage to secure this indebtedness; that a resolution of the board of directors directed the officers to execute to defendant the bond and mortgage here in controversy; that when the mortgage came to be executed the officers of the company told the defendant they were without sufficient means to begin work on the contracts which they then had for the manufacture of wall paper, and requested the defendant to advance them some money with which to get the business started.

That on the 13th day of December, 1901, the defendant advanced to the company in cash $1,627; on the same day the further sum of $113; on the same day, the further sum of $250, making due to him on the contract for extra work and money advanced, the sum of $20,917.66; that on the 1st of November, 1901, the company had paid him $1,500, making the total amount due on the mortgage at the present time the sum of $19,417.66, together with interest thereon from the date of the mortgage.

The defendant filed an amendment to his answer, repeating in detail the contract between him and the Hobbs company for the erection of its building, and his performance thereof, and also extra work done by him for that company. He also again states that he learned that the company's subscription for its capital stock had not been paid in, and that the company was

without funds to pay him, and mentions the 15th day of November, 1901, as the date on which he received this information. He states that he refused to go on with his contract, but finally completed it and also a large amount of extra work under a promise that he should have a mortgage for his debt. He repeats his averment that a meeting of the board of directors adopted a resolution directing the company's officers to execute to the defendant the bond and mortgage now in controversy. He also repeats his claim that when the bond and mortgage were executed, the officers stated to the defendant that they were without sufficient means to begin work upon contracts which they then had, requesting him to advance them some money to start their business. He states, in his amendment, that he advanced to the company in cash on the same day the several sums of $1,637, $113 and $250, and that when he was about to accept the mortgage he learned that one David M. Hess held a mortgage of $2,000 on the premises. He states that the defendant agreed with the Hobbs company to pay off that mortgage, and actually did pay the same, and that said $2,000 was added to the amount then due by the company to the defendant, and formed part of the consideration of the mortgage, making the total sum due to the complainant to be the sum of $20,000.

Issue has been joined on the defendant's answer, and the cause has come to hearing on these pleadings.

All the property of the insolvent company which is covered by the defendant's mortgage has been sold by the receiver under an order of this court, clear of the mortgage lien, on petition, &c., under section 81 of the General Corporation act. *P. L. of 1896 p. 303.* The real estate produced $6,600, and the personal property which is included in defendant's mortgage, produced about $450. These sums are held by the receiver, subject to the decree of the court in this cause as to the validity of the defendant's mortgage upon the properties sold.

*Mr. Howard Flanders* and *Mr. Samuel W. Beldon,* for the complainant.

*Mr. John F. Harned,* for the defendant.

GREY, V. C.

The bill of complaint in this case challenges the validity of the mortgage for $20,000, held by the defendant, upon several grounds:

*First.* That though given in the name and under the seal of the mortgagor company and proven by the annexed oath of the secretary to have been made "pursuant to resolution of the directors" of that company, there was not, in point of fact, any vote of the board of directors that the mortgage should be given.

*Second.* The complainant insists that when the mortgage was made, the mortgagor company was either insolvent or certainly in contemplation of its insolvency, and that it is therefore invalid under the section of the Corporation act, which prohibits the officers of a corporation from disposing of its property under such circumstances. *P. L. of 1896 p. 298 § 64.*

*Third.* That the mortgage, so far as it undertakes to be a chattel mortgage, is invalid, because the affidavit of the mortgagee annexed does not truly state the consideration of the chattel mortgage, as required by the Chattel Mortgage act (*Gen. Stat. p. 2113 § 4*), which was in effect when the mortgage was made, and has been re-enacted in the act concerning chattel mortgages. *P. L. of 1902 p. 487.*

On the first point, that the defendant's mortgage was not authorized to be made by any action of the board of directors of the Robert S. Hobbs Company, a short summary of the evidence will show the *status* of the company previous to and at the time when that mortgage was given. It was organized in May, 1901, and began preparations for business upon an extended scale shortly after, by the erection of buildings and making of blocks, patterns and purchase of machinery. It had almost no money with which to pay the debts incurred in these preparations for business, its cash subscriptions to the capital stock were not paid into the company's treasury to any substantial extent, so that from the very start it was continually in debt for both large and small sums of money, owing for matters which, in the usual course, are paid for in cash. Its business was conducted by borrowing from whomsoever would lend money to it. Sometimes in petty sums for necessary imple-

ments; sometimes in larger sums, to pay for wages and other cash items. Samuel Gourley, Jr., who personally conducted the erection of the buildings under the contract with the company, either for himself or for his father, Samuel Gourley, Sr., made a number of advances of small sums to pay cash items which were necessary to keep the company going.

This condition of affairs continued from bad to worse, and culminated in November, 1901 (about six months after the company was organized), when it became plainly apparent that unless a large sum of ready cash was obtained for the company's use it would be unable to complete its works and manufacture wall paper in the usual course of the trade. By the first week in December, 1901, a large number of orders for such goods had been obtained, a small portion of completely manufactured goods had been made and delivered, although the works had not yet been completely finished. The executive committee of the board of directors then passed a resolution authorizing the creating of a $20,000 mortgage upon the company's property, to place which a commission of ten per cent. was to be allowed. This resolution was afterwards, on December 5th, 1901, as appears by the minutes, ratified by the board of directors. This resolution, while it authorizes the making of a mortgage for $20,000, does not in any way refer to the defendant as the intended mortgagee. One of the directors, who is recorded as voting for the resolution, and whose vote was necessary to its passage, declares that there never was any authorization of the making of the mortgage to Samuel Gourley, Sr.

The terms of the resolution (when considered in connection with the defendant's affidavit annexed to his mortgage) make it most improbable that it was passed to authorize the making of that mortgage, which it is now invoked to support. After authorizing the creation of a mortgage for $20,000 upon all the company's property, without stating to whom it should be made, the resolution directs the payment of a commission of ten per cent. for the placing of the mortgage. The defendant's own affidavit annexed to the mortgage declares that

"the true consideration of the said mortgage is as follows, to wit: Twenty Thousand dollars; $2,000 thereof in cash loaned by the mortgagee to the mortgagor, and the balance thereof in work and labor performed by the mortgagee for the mortgagor at its request," &c.

If it be true that the resolution in the minutes refers to the mortgage now in dispute, then it authorized the officers of the company to secure the debt of $18,000, which the company owed the defendant for work and labor done, by a mortgage upon all the company's property, and to pay him $2,000 in commissions for taking the mortgage to secure his own debt!

I find it impossible to believe that the resolution referred to was intended to give any such authority. The company at that time had no money. It was overwhelmingly in debt. It wanted cash to pay its various creditors, and was willing to submit to the payment of a ten per cent. premium to get it. No particular mortgage was in contemplation when the resolution was passed, and for this reason no mortgagee was named in the resolution. Any mortgagee who would raise the $20,000 in cash would have been acceptable. None could be had. The company's financial situation was desperate. The defendant, Samuel Gourley, Sr., was the largest creditor. His son, Samuel Gourley, Jr., was in frequent conference with the company's officers, and knew of its embarrassments, and of the peril to the Gourley claims for erecting the company's buildings. The defendant, in his answer, admits that he solicited the making of the mortgage now in dispute. Under these circumstances, the officers of the company, without any authority from the board of directors to make a mortgage to the defendant, Samuel Gourley, Sr., executed to him, for $20,000, the mortgage now challenged. It contains no reference to, or recital of, any resolution of the board of directors of the company authorizing it to be made. As above shown, no resolution of the board did, in fact, authorize it to be made, but the secretary of the company, who favored the securing of Mr. Gourley's claim, and Mr. Gourley himself, now appeal to the resolution which directed the making of a mortgage for $20,000, obviously intended to raise cash, as authority to make a mortgage for $20,000 to secure (as to $18,000 of it)

Miller *v*. Gourley.

an antecedent debt of the company, and which, in fact, raised but the small sum of $1,637 in cash.

The affidavit of the secretary annexed to the defendant's mortgage is upon a printed form, which recites that the mortgage was made "pursuant to resolution of the board of directors," but no resolution has been proven which authorized the giving of that mortgage, and I am satisfied that the board of directors never ordered that mortgage to be made. It was the voluntary act of those officers of the company who desired to secure for Mr. Gourley the payment of his claim against the company.

This view is supported by the phrasing of the resolution, by the testimony of the directors who voted for it, and by the varying and contradictory statements made by the defendant and his son in their endeavor to state how the $20,000 was made up for which the mortgage is, on its face, expressed to be given.

The defendant, Samuel Gourley, Sr., in his affidavit annexed to the mortgage, and taken on December 13th, 1901, the date of the mortgage, says the consideration of the mortgage was—

```
"Cash loaned ........................................ $2,000 00
 Work and labor performed........................... 18,000 00
                                                     ──────────
      Total amount of mortgage........................ $20,000 00
```

"Besides lawful interest thereon from the 13th day of December, 1901."

In his sworn answer in this cause, filed June 21st, 1902, the defendant says the consideration of the mortgage was ascertained as follows:

```
"Contract price ...................................... $12,500 00
 Extra work .......................................... 6,417 66
 Cash advanced ....................................... 1,637 00
      "        "     ................................. 113 00
      "        "     ................................. 250 00
                                                      ───────────
                                                      $20,917 66
 Cr. by payment on account made November 1, 1901...... 1,500 00
                                                      ───────────
                                                      $19,417 66"
```

making, he alleges in his sworn answer, "the total amount now due to this defendant upon said mortgage, the sum of $19,417.66." That is, on December 13th, 1901, he swore that $20,000 principal was due on the mortgage, which was to draw six per cent. interest. On June 21st, 1902, with no pretence that any payment of either principal or interest had been paid since the mortgage was given, he swore that the mortgage debt was, with varying items, but $19,417.66.

By an amendment to his answer, filed January 5th, 1903 (not sworn to), he restates the items of the mortgage-money as last above given, making it $19,417.66, and then adds this clause:

"That when this defendant was about to accept said mortgage, he learned that one David M. Hess held a mortgage of two thousand dollars on said premises, the lien of which was prior to that of this defendant; that this defendant agreed with said company to pay off said mortgage of two thousand dollars, and did actually pay the same, and that said two thousand dollars was added to the amount then due by said company to this defendant, and formed part of the consideration of said mortgage, making the total amount now due to this defendant upon said mortgage the sum of twenty thousand dollars."

By any calculation I can make, the total amount due on the mortgage, if the $2,000 for the Hess mortgage were added to the $19,417.66, would be $21,417.66. This new sum of $2,000 is not referred to in the affidavit annexed to the mortgage.

At the hearing, the son, Samuel Gourley, Jr., who had conducted all the business with the Hobbs company, was examined as to the specific items going to make up the amount for which the mortgage was given. He was quite unable to show specific sums which approximated reasonably near $20,000, and he varied the items substantially from those given by his father. On cross-examination the son was obliged to admit that he had given a receipt, dated the 13th day of December, 1901, the date of the mortgage, which stated the

| | |
|---|---:|
| "Balance due on contract | $9,500 00 |
| On extra work | 4,500 00 |
| Fee in placing mortgage | 2,000 00" |

Miller *v.* Gourley.

The father had, by his affidavit annexed to the mortgage, dated December 13th, 1901, stated the consideration to be $2,000 cash and the balance, $18,000, to be for work and labor. The son, on the same day, by his receipt, states the work and labor to have been $14,000, omits all cash, and puts in a commission for $2,000. The testimony given by the son was entirely unsatisfactory when he attempted to explain how the mortgage to his father came to be taken for $20,000.

Mr. Thron, the secretary of the company, and, for a time, its assistant treasurer, and the active business man in securing the company to give the defendant's mortgage, made the entries in the cash-book of the company on December 13th, 1901, which explain what he desired to be understood to be the items going to make up the mortgage in question. Mr. Thron's statement varies substantially, both from the affidavit of the defendant, Samuel Gourley, Sr. (annexed to the mortgage, bearing the same date as Mr. Thron's entries in the books of the company), and also from the testimony in this cause given by Mr. Samuel Gourley, Jr., and also from memoranda purporting to be explanatory of the items of this mortgage, also made by Samuel Gourley, Jr.

Mr. Thron's entries in the cash-book, showing both sides of the account, are as follows:

*"Dr. to cash:*

"1901—Dec. 13—
  To mortgage acct. from S. Gourley as per resolution
          of board 12/5/01............................ $20,000 00"

The corresponding entries are:

*"Cr. by cash:*

"1901—Dec. 13—S. Gourley Jr. Bal. due on contract...... $9,500 00
  "      "      "    "      "      "  on acct. of extras,  } ...... 4,500 00
                                        bill to be rend.  }
          Expense act. com. of 10% on placing Mortg....... 2,000 00
          Mortgage act. to pay off Hess mortg............. 2,000 00
          Expense act. W. J. T. Co. for Title Ins. etc....... 113 00
          Bills payable—note due S. Gourley, Jr............ 250 00
          "         "         "    "  F. J. Thron............. 450 00
          Expense act. incidentals in settlement............. 2 35
          "       "  J. V. Ripperger, Daniels & Co. case... 100 00
                                                          _____
          The total of these items amounts to......... $18,915 35"

It may be noted that Mr. Thron, by this settlement, appears to have secured the payment of his own note for $450 as part of the cash items satisfied by the mortgage-money. It is also noteworthy that, by Mr. Thron's entries, Mr. Gourley's debt for contract work and extras is shown to be $14,000, though, on the same day, Mr. Gourley, Sr., swore it was $18,000 in his affidavit annexed to his mortgage. Mr. Thron's entries also show that the mortgagee was allowed a commission of $2,000 for taking a mortgage securing his own debt of $14,000, on which the cash payments ($915.35) were less than the commission.

In argument the defendant contends that the defendant's mortgage should be sustained as a valid lien upon the company's real estate, because it is claimed the defendant had, under the mechanics' lien statute, a lien upon the building, which he erected, and the curtilage whereon it was built, and that the giving of the mortgage in the place and stead of the mechanics' lien was a good and valuable consideration.

There is no proof that the contract under which the company's buildings were erected was filed in the county clerk's office, securing the defendant the exclusive right to a mechanics' lien. If the defendant, Samuel Gourley, Sr., had a right of lien because of the debt owing for the erection of the building, the statute gave the same right to all other creditors who furnished work or material for the erection of those buildings. If Mr. Gourley was entitled, under the Mechanics' Lien act, to be paid out of the proceeds of the sale of the property, he must have shared *pro rata* with other creditors having a lien. *P. L. of 1898 p. 550* § *29.* There is no such proof in this cause as enables this court to know what was the value of Mr. Gourley's interest in the lien (if he had any) for which he might have taken his mortgage. There is no evidence that, on taking his mortgage, the defendant released or discharged his lien or agreed to do so, in consideration of the giving of his mortgage. His affidavit annexed to the mortgage does not mention any release of lien as consideration. The suggestion of the defendant's right to a lien, as furnishing any consideration for the giving of his mortgage, is a matter which plainly was not dealt with by the parties at the time the mortgage was given.

The defendant also contends that part of the consideration of his mortgage, was his undertaking to pay off a preceding mortgage upon the company's property, known as the "Hess mortgage," for $2,000. The defendant's own affidavit, annexed to his mortgage, does not mention this undertaking as part of the consideration of that mortgage. Mr. Hess is not claimed to have been a party to the undertaking. It was not a novation, whereby the company's estate was exonerated from the payment of the Hess mortgage and the defendant substituted in the company's place. At most, it was a mere promise to pay. The defendant never did, in fact, relieve the company's estate from the obligation of that mortgage. The Hess mortgage was a charge upon the company's property on December 13th, 1901, when the defendant's mortgage was made. It remained a charge at the time the receiver was appointed, on January 15th, 1902. It still remained a charge in June, 1902, when the receiver sold the mortgaged premises. He announced publicly to persons present that his sale of that property would be subject to the lien of the Hess mortgage. The defendant heard that announcement and said nothing about his being under contract to pay that mortgage. The defendant stood by while bids were made under the receiver's proclamation that the property would have to pay the Hess mortgage, and was himself a bidder and finally became the purchaser of the mortgaged premises from the receiver, under that proclamation. After the defendant had thus obtained, as bidder and purchaser, the benefit of the reduced price paid for the property because of the receiver's proclamation, and had himself become the owner of the mortgaged premises, he paid off the Hess mortgage. .

If the undertaking of the payment of the Hess mortgage was part of the consideration of the defendant's mortgage (contrary to the defendant's own affidavit annexed thereto) then that undertaking was never performed, for its obvious purpose and intent was that the payment should be so made as to enure to the benefit of the company, but in fact the defendant did not pay the Hess mortgage until the mortgaged premises had been sold from the company, still subject to that mortgage, and the

defendant had become the purchaser. The payment was for his own benefit, and not for the benefit of the company.

I have now gone over all the variant and contradictory statements which attempt to explain what was the true consideration of the defendant's mortgage. The witnesses who claim to have made or obtained that mortgage are all of them interested in maintaining its validity. They are, as is above shown, unable to state with any reasonable agreement between themselves how it came to be made to Samuel Gourley, Sr., for $20,000. No two of them stand together in testifying that the mortgage was made for the same items for the same amounts. This variance and the uncertainties in their statements confirm me in the belief that the mortgage was not, in fact, made under the authority of the resolution of the board of directors which appears in the minutes, naming no mortgagee, but that it was the outcome of an effort on the part of the officers of the company to use that resolution to protect and favor the defendant as a preferred creditor of the company.

The complainant's first contention that the defendant's mortgage was not authorized to be made by the board of directors of the company is therefore sustained.

It does not, however, follow that the mortgage, though not authorized to be made previously to its execution and delivery, is therefore utterly invalid for all purposes.

The mortgage was duly executed by the officers of the company with the seal of the company annexed. It was formally proven by the deposition of the secretary of the company annexed to the mortgage that it was executed pursuant to resolution of the directors. It was by the company's officers delivered to the mortgagee, completed with all the formalities on its face necessary to charge the company with its obligation. The proofs show that some money, at least, was passed by the mortgagee to the company's officers, or paid by him to its order, coincidently with their delivery of this mortgage to the mortgagee, induced by the security it tendered.

If a corporation mortgage shows on its face a compliance with all legal requirements necessary to make it a lien on the corporation's property, and by the endorsed deposition of the

Miller *v.* Gourley.

company's secretary, appears to have been made pursuant to a resolution of the· board of directors, and is delivered by the company's officers to the· mortgagee, who coincidently advances to the· company part or the whole of the money, the mortgage ought not to be held to be ·invalid to secure such advances, even if in fact it was made without any previous resolution of the board. The acceptance of the defendant's money, paid on the giving of its mortgage, estops, to the extent of the money so paid, the company from denying the validity of the mortgage used to obtain that money.

The defendant's mortgage should, I think, be held to be valid to the extent that, relying upon its security, he actually advanced or paid money or values to or for the Robert S. Hobbs Company.

*Secondly.* Was the mortgage made when the company was insolvent, or in contemplation of its insolvency, so that it is invalid against creditors of the company under the provisions of section 64 of the General Corporation act?

It will be noted that under section 64 of the Corporation act, if the company is insolvent or has suspended its ordinary business, or if its officers attempt any of the acts of transfer prohibited by that section in contemplation of its ·insolvency, they are by the statute incapacitated to accomplish any of those acts, save only that under the proviso in that section, a *bona fide* purchaser for a valuable consideration, under the circumstances detailed in the proviso, will not be invalidated.

The object of the sixty-fourth section of the statute can be ascertained by reading the title of the original act, which was "An act to prevent frauds by incorporated companies." *P. L. of 1829 p. 58.* It is not the purpose of the act to deprive the officers of an incorporated company of the power to conduct the business of the company, by so disposing of its property that its insolvency may be avoided or remedied, if such action is taken in good faith, and secured to the company a full and fair consideration passing coincidently with the transfer of its property in the conduct of its business. Such dealings are in no sense frauds. The company's assets after such a transaction, though changed in their nature, are still intact as to value and

ability to respond to creditors. If a mortgage be so made, it stands for the property sold or transferred in good faith. But the act is intended to prevent the officers from disposing of the company's assets to those of its creditors who are favored by the officers. Such preferential transactions by officers of corporations have always been held to be prohibited while this statute was in operation, and to have been permissible while it was off the statute-books. *Wilkinson* v. *Bauerle, 14 Stew. Eq. 635, 641 (Court of Appeals)*, and the list of causes cited in *Savage* v. *Miller, 11 Dick. Ch. Rep. 438,* in the opinion of Mr. Justice Garrison, also in the court of appeals. This subject is discussed in the case of *Recd* v. *Helois Carbide Co., 19 Dick. Ch. Rep. 242.*

In the present case the defendant, Samuel Gourley, Sr., claims that the Robert S. Hobbs Company was not insolvent at the time the mortgage was made to him, on December 13th, 1901; that, at that time, the insolvency of that company was not in contemplation in the giving of that mortgage, and that he, in accepting the mortgage, occupied the position of a *bona fide* purchaser without notice, referred to in the proviso.

The statute applies to the financial situation of the corporation existing at the time the challenged transfer of the company's property is actually made. *Wells* v. *Rahway White Rubber Co., 4 C. E. Gr. 405.*

The proofs submitted on this point are quite voluminous. They have been directed, to a great extent, to show that the company, at the time the mortgage was made, was possessed of property sufficient in value to pay its debts. This property consisted of patterns, designs and blocks for making wall paper, (which cost a large sum of money, but which were practically not salable), of contracts for future manufacture and sale of wall paper, and of its buildings and plant, all of which, it is insisted, were worth at least what they cost.

So far as cost is ascertained by payment made, the company's property had cost it very little. The company never had any substantial sum of money of its own in the treasury.

The defendant contends that the only test of insolvency which, under the statute, can be applied to such a corporation as the

Robert S. Hobbs Company is whether it has, at the time the challenged act is done, actually suspended its business. The defendant's counsel refers to the language of Chancellor Green, in *Bedford* v. *Newark Machine Co., 1 C. E. Gr. 120:* That the suspension of its ordinary business is the only criterion which the statute gives to ascertain the insolvency of companies other than banks.

A reading of the terms of section 64 will show that the prohibition it contains becomes applicable whenever the corporation becomes insolvent, *or* suspends its ordinary business for want of funds to carry on the same, *or* when the prohibited act is done in contemplation of the company's insolvency. Here are three contingencies, any of which existing, the company's officers are precluded from transferring its property.

What is meant by insolvency has been defined by this court and the court of appeals so clearly that there ought not to be any further question about it. A review of the cases may be found in the opinion of Vice-Chancellor Reed, in the case of *Skirm* v. *Eastern Rubber Manufacturing Co., 12 Dick. Ch. Rep. 184.* The court of appeals, in *National Bank* v. *Sprague, 6 C. E. Gr. 538,* declared that "insolvency means a general inability of a debtor to answer pecuniary engagements, and it does not follow that he is not insolvent because he may ultimately have a surplus after winding up his affairs."

It seems but a fair construction of the words "suspend its ordinary business for want of funds," &c., to hold that they include the suspension of payment of the company's debts in the usual conduct of trade.

The Robert S. Hobbs Company, from its very inception, was in such a condition of insolvency, for the sufficient reason (stated by the defendant, in his answer, to have been known by him before he took his mortgage) that its subscriptions to its capital stock had not been paid to the company. It never had the money to pay its debts. Its salary contracts alone, beginning on May 1st, 1901, at the organization of the company, amounted to $9,500 per year, payable in semi-monthly installments, for which it was, at all times, in arrears. Its only sources of funds (except borrowing) were its capital stock and its earnings. The com-

pany's answer in the insolvent suit in which the receiver was appointed, declares that but $600 was paid on its subscriptions to stock, into the company's treasury in cash. The receiver was appointed before the company had perfected and completed its plant so as to engage in profitable business. In substance, it had no earnings. Without cash capital or earned profits, it was necessarily in a condition of general inability to meet its pecuniary engagements.

This situation of affairs was within the constant knowledge of the officers of the company, was openly recognized before they gave the defendant his mortgage, and was admitted by the defendant himself by the acts and conduct of his son and agent, Samuel Gourley, Jr., and by the circumstances which attended the taking of the mortgage.

The attitude of the defendant, Samuel Gourley, Sr., to this mortgage is somewhat peculiar. The greater part of the money secured by the mortgage is claimed to have been earned by Samuel Gourley, Sr., under his contract to erect the company's buildings. He did not bid for that contract, is not named in making it, and did not appear during its performance. All these matters were entered upon and carried on by the son, Samuel Gourley, Jr.

The receiver's counsel insists that the building contract was, in fact, made between the company and Samuel Gourley, Jr., the son, and that the father was, by the assent of the company's officers, substituted as the creditor to whom the mortgage should be given on December 13th, 1901, leaving the son free to file the insolvency bill of complaint against the company, which he did, as stockholder and creditor, on January 15th, 1902. Nothing had happened between December 13th, 1901, when the defendant's mortgage was given, and January 15th, 1902, when the insolvent bill was filed, which changed the financial situation of the company. It was insolvent at both those dates and for a long while before.

This suggestion of collusive substitution of the creditor is sustained to a considerable extent by the proofs, and by the fact that the insolvency bill filed by Samuel Gourley, Jr., states and recognizes the validity of the $20,000 mortgage held in

the name of his father as a lien on all the company's property, and the answer of the company, filed by its officers in its name to the insolvency bill, also recognizes the validity of that mortgage. Both Samuel Gourley, Jr., and the officers of the company were, when these proceedings took place, well acquainted with all the above-recited incidents touching the consideration of that mortgage. The company's answer in the insolvency suit admitted its insolvency, and that only $600 of the subscriptions to its capital stock had been paid in cash. The insolvency bill by Samuel Gourley, Jr., and the answer thereto by the company, were both filed on the same day, and on the day of filing —January 15th, 1902—a receiver was by this method obtained to be instantly appointed. In all probability there was a pre-arrangement between Samuel Gourley, Jr., and the officers of the company in order to accomplish such instantaneous and coincident results. The bill and the answer are apparently endorsed in the same handwriting.

The challenge of the defendant's mortgage presently under consideration, was raised by the receiver, and has received little aid from those who had been active in the management of the company.

It has not been necessary to examine and pass upon the detailed proofs submitted regarding the collusive substitution of Samuel Gourley, Sr., as the creditor of the company in the place of Samuel Gourley, Jr., for the reason that, assuming that Samuel Gourley, Sr., the defendant, was, in fact, the creditor of the company, to whom it owed the debt for erecting its buildings, it is clearly shown that in the conduct of all the business pertaining to the making and performing of the contract for that work, and the securing of the payment therefor by the defendant's mortgage, Samuel Gourley, Jr., the son, must have been the active agent of his father. The son was, during the whole period from June to December, 1901, in frequent attendance at the company's place of business, superintending the building work and in conference with its officers, seeking and failing to collect the moneys coming due on that contract. He several times loaned petty sums of cash to the company to

supply urgent needs. He certainly knew long before the mortgage was made that the company's financial situation was hopeless.

The father, Samuel Gourley, Sr., first came to the front as an actor in the business in the early part of December, 1901, at which time it was obvious the company could not pay its debts. Samuel Gourley, Sr., then took an interest, apparently, solely to obtain the mortgage now in dispute. All the knowledge touching the company's financial embarrassments which came to the son is clearly imputable to the father, for whom he acted, if, in fact, the father was the contractor. In addition to this the father's own knowledge and his statements touching this mortgage show that it was taken because the company was known to be unable to meet its pecuniary liabilities. His answer in this cause shows that he knew in November, 1901, a month before he took the mortgage, that the company could not pay him what was due on the contract, because its subscriptions had not been paid into its treasury. He certainly must have known that the company had then no other source from which to get money, for as yet the buildings on which he was working had not been entirely completed, so as to be used in any productive way to manufacture goods, the sales of which were the only other source whence the company might get money.

The testimony satisfies me that at the time the defendant's mortgage was given the Robert S. Hobbs Company was insolvent; that the officers of the company made that mortgage in contemplation of the impending failure of the company, intending, as to the greater part of the mortgage money, to give to the defendant the position of a preferred and secured creditor of the company. So far as these acts of the officers of the company attempted to secure to the defendant a pre-existing debt, the mortgage must be held to be invalid under the statute.

The third contention of the complainant is, that the defendant's mortgage, so far as it is claimed to be a chattel mortgage, is invalid, because the defendant mortgagee's affidavit annexed to it does not state the true consideration of the mortgage, as required by section 4 of the Chattel Mortgage act.

Miller *v.* Gourley.

The affidavit of consideration is in the words and figures following:

"State of Pa. ⎫
"County of Phila. ⎭ *ss:*

"Samuel Gourley, the mortgagee in the foregoing mortgage named, being duly sworn, on his oath says that the true consideration of said mortgage is as follows, to wit: Twenty Thousand Dollars [two thousand dollars thereof] in cash loaned by the mortgagee to the mortgagor [and the balance thereof in work and labor performed by the mortgagee for the mortgagor at its request] and that the amount owing upon said mortgage and payable according to the provisions thereof is Twenty Thousand Dollars besides lawful interest thereon from the thirteenth day of December, 1901,

"S. Gourley.

"Sworn and subscribed this
Thirteenth day of December
1901, before me at Phila. Pa.
                    "Bella D. Berkheiser,
    [Notarial seal.]                    *"Notary Public.*

"Com. Exp. Feb. 27th 1905."

The portion of the above copy which is not included in brackets shows the affidavit as it was originally drawn. It was all in one handwriting, and was complete in itself, and stated the consideration to be "Twenty Thousand Dollars in cash loaned by the mortgagee to the mortgagor." Interlineations above included in brackets are inserted in the original in a different handwriting, precisely as above shown, and appear to have been made at the time the mortgage was executed, thus changing the mortgage from what it was intended to be—a cash mortgage—to one securing, in great part, a pre-existing debt owing to the defendant. This change supports the conclusion that the original purpose of the making of a $20,000 mortgage was to raise cash, and that this was perverted to the securing of defendant's debt.

The above comparison of the statements of the defendant, Samuel Gourley, Sr.; of his son, Samuel Gourley, Jr., and of Mr. Thron, the company's secretary, and the documentary proofs touching what constituted the true consideration of the defendant's mortgage, show that, whatever that true consideration may have been, it certainly was not $2,000 in cash, loaned by the mortgagee, and the balance ($18,000) work and labor performed

17

by him for the mortgagor, as the defendant mortgagee states in his affidavit annexed to his mortgage. Nobody testifies that it was, not even the mortgagee himself.

The contention that the affidavit does not state the true consideration of the mortgage, and that it is therefore void as a chattel mortgage, under section 4 of the Chattel Mortgage act, must therefore be sustained.

The result is that the defendant's mortgage should be held to be a valid lien only upon the real estate, and not upon the personal property therein described; that it should be held to be good only to the extent of the money actually paid out by the defendant as new consideration, induced thereto by the security of his mortgage.

Some of the defendant's claims, under his mortgage, have been disposed of in this opinion. The testimony as to the cash payments made by the defendant on the strength of his mortgage is not sufficiently clear to enable me to state the account. If the parties can agree upon the sums which properly come within the class herein declared to be secured by the defendant's mortgage, there will be no need of a reference. Otherwise, a master may state the account, considering the testimony herein presented, and taking such additional proofs as may be necessary.

I will advise such a decree, with costs against the defendant.