3d Exception. That the commissions are insufficient.

The commissions allowed are moderate; but as the case now stands, I am not disposed to interfere with this part of the report, and accordingly overrule the exception.

This is not a case for costs against the executors.

The President, Directors and Company of the STATE BANK AT NEW-BRUNSWICK v. The Receivers of the BANK OF NEW-BRUNSWICK.

A claim which cannot be allowed as a set-off under the act to enable mutual dealers to discount, may nevertheless be allowed as a set-off by receivers, under the act to prevent frauds by incorporated companies.

The act entitled "An act to prevent frauds by incorporated companies," partakes largely of the character of a bankrupt law. The general object of the act and the provisions made to effect it are essentially the same as the bankrupt law; and it seems proper to apply to it the general rules that govern the bankrupt system where it is in use.

The act does not confine itself to *legal* set-offs, but refers to *just* set-offs, and expressly directs the receivers to allow them when they ought to be allowed according to *equity*. It gives to receivers an equitable power, and they are to exercise it according to the justice of the case.

Where the creditor has two funds, one separate and one in common with others, he must first look to his separate security, and after that is exhausted he may look to the fund in which others are interested.

The property in the hands of receivers is considered as in court and under its control, to be administered so as best to subserve the purposes of equity.

As soon as the assets are withdrawn from the debtor and placed in the hands of receivers, the general creditors acquire rights, which the court will protect by placing all the creditors on an equality as far as possible.

THIS case came before the court upon an appeal taken by the State Bank at New-Brunswick, from a decision made by the

receivers of the Bank of New-Brunswick, appointed under the act entitled "An act to prevent frauds by incorporated companies," passed the sixteenth of February, eighteen hundred and twenty-nine, (*Elmer's Digest*, 32.) The facts of the case, and the grounds of the appeal, are stated in the opinion of the chancellor.

*J. W. Scott*, for the petitioners.

*E. Wood*, for the receivers.

THE CHANCELLOR. The facts of the case are briefly these. On the first day of February, eighteen hundred and thirty-four, and before the Bank of New-Brunswick stopped payment, the State Bank had in possession nine hundred dollars in bills of the Bank of New-Brunswick, which had been regularly received in the course of business; and the further sum of four thousand two hundred and thirty-eight dollars, which had been remitted to the State Bank from the Trenton Banking Company for the purpose of collection, either one or two days before. These two sums, amounting in the whole to five thousand one hundred and thirty-eight dollars, the State Bank presented at the counter of the Bank of New-Brunswick, on the said first day of February, and demanded payment. On the sixth of February, the Bank of New-Brunswick not having redeemed said bills, placed in the hands of the State Bank, R. F. Stockton's note, endorsed by J. R. Thompson and F. Richmond, cashier, for six thousand dollars, as collateral security for the payment of the said sum of five thousand one hundred and thirty-eight dollars, and took a receipt specifically stating the amount and object.

On the twelfth day of February, the Bank of New-Brunswick, by their cashier, delivered over and endorsed to the State Bank, R. F. Stockton's draft, as president of the Delaware and Raritan Canal Company, on James Neilson, treasurer, and accepted by him, for one thousand dollars, dated January seventeenth, eighteen hundred and thirty-four, and payable at ninety days; which

was to be held as a collateral security for any bills of the Bank of New-Brunswick at that time unredeemed, or which might thereafter be unredeemed at the counter of the State Bank.

Shortly afterwards, the six thousand dollar note of Stockton and Thompson was, in consequence of some arrangement between the Bank of New-Brunswick and the Trenton Banking Company, delivered up to the said Trenton Banking Company by the State Bank, for the sole use and benefit of the said Trenton Banking Company; and in lieu of their interest in it, the State Bank received of the Bank of New-Brunswick a draft of R. F. Stockton, president, and John R. Thompson, secretary, for one thousand dollars, drawn on James Neilson, and accepted, and endorsed by E. Baldwin and F. Richmond, cashier, as a collateral security for the said nine hundred dollars in notes of the Bank of New-Brunswick; and gave a receipt for it, dated the fourteenth of February, eighteen hundred and thirty-four.

On or about the eighteenth of February, the Bank of New-Brunswick stopped payment. Prior to that day, the State Bank had received at their counter in the regular and ordinary course of business, three thousand and ninety-seven dollars in bills, for which they have no other security than the bills themselves, and the proceeds of the two drafts of one thousand dollars each. Those drafts fell due on the nineteenth of April, and were paid at maturity.

On the seventeenth of May, eighteen hundred and thirty-four, the State Bank presented the bills of the Bank of New-Brunswick to the receivers, that is to say, three thousand and ninety-seven dollars, and claimed a right to a dividend on that amount and a certificate therefor. The receivers refused to admit the claim. It appears from a minute of their decision, that they considered the one draft of one thousand dollars as a collateral security for the specific sum of nine hundred dollars in possession of the State Bank at the time the draft was assigned; and that the other was a collateral security for the redemption of bills unredeemed when the draft was received, or that might be thereafter unredeemed. They considered, also, that the one hundred

dollars of the first draft received by the State Bank, over and above paying the nine hundred dollars for which the draft was specifically pledged, ought not to be admitted by them as a proper offset, but that the same belongs to them as so much money had and received for their use, to be collected and held by them for the benefit of the creditors and stockholders of the Bank of New-Brunswick. The State Bank, nevertheless, insisted on their right to retain the one hundred dollars, with the remaining draft, as collateral security, to indemnify them against any loss they might eventually sustain on the bills of the bank held by them.

The receivers then offered to offset against the said bills the sum of nineteen hundred dollars received by the State Bank on the said drafts, and to allow the said State Bank a claim for the residue after deducting the said sum of nineteen hundred dollars. The State Bank declined the offer thus made, and insisted on having their claim admitted for the whole amount of the bills on hand, and retaining the monies received on the drafts to indemnify them against such loss as might eventually be sustained on the said bills. This being refused by the receivers, the State Bank has appealed to this court, according to the provisions of the eighteenth section of the act entitled "An act to prevent frauds by incorporated companies," passed February sixteenth, eighteen hundred and twenty-nine.

1. As to the nine hundred dollars of bills on hand at the time the first draft for one thousand dollars was given ; the petitioners cannot make claim for that debt, or prove it before the receivers. The draft was given as security for a specific sum, being less than the amount of the draft. The object was special and limited, and the State Bank, on receiving the money for the draft, could appropriate it only to the purpose for which it was pledged. The contracts in relation to the two drafts were distinct as to time and object. The drafts had separate ends to answer, and there is neither justice nor propriety in blending them. This, in fact, has been admitted by the written argument with which I have been favored, and it is unnecessary to consider it further. As to

this part of the case, the State Bank has yielded to the views of the receivers, admitting them to be right.

2. After appropriating nine hundred dollars of the first draft to the payment of that amount of bills, for which it was specifically pledged, there remains one hundred dollars of it to be disposed of. The receivers contend that this belongs to the general fund for the benefit of all the creditors, as part of the assets of the Bank at the time of the suspension of payment. The petitioners claim the right to offset against it the like amount in bills of the Bank of New-Brunswick on hand at the time of the failure.

I think that under the provisions of our statute, to enable mutual dealers to discount, this claim could scarcely be allowed. The statute has reference to mutual debts between the parties; whereas the cases cited by the counsel for the petitioners are cases governed by the bankrupt laws of England, by which laws the right of set-off is enlarged so as to extend to mutual credits. Such are the cases *Exparte Deeze*, 1 *Atkyns*, 228; *Exparte Charles Prescot*, 1 *Atkyns*, 230; *Atkinson and al.* v. *Elliot*, 7 *T. R.* 378; *Cooke's Bankrupt Laws*, 567.

I incline to the opinion, nevertheless, that this set-off should be allowed; and for two reasons. 1. The act under which these proceedings are had, partakes largely of the character of a bankrupt law. As was well remarked by the receivers in their argument, " the general object of the act, and the provisions made to effect it, are essentially the same as the bankrupt laws." Under the bankrupt system, the claim would be admissible; and if this act is to be considered as partaking of the character of a bankrupt law, it is proper to apply to it the general rules that govern the system where it is in use.

Another reason is, that the words of the act under which these proceedings are had, in relation to this species of set-off, are peculiar and liberal. " In case of mutual dealings between the said corporation and any other person or persons, the receivers are to allow just set-offs in favor of such person or persons, in all cases in which it shall appear to them that the same ought to be allowed according to law and equity :" *Har. Com.* 212. The general act

before adverted to, (*Rev. Laws*, 307,) refers only to *mutual debts*, and it is plain that *legal* set-offs must be confined to cases of that description. The act upon which the court is now called to adjudicate, does not confine itself to legal set-offs. It refers to *just* set-offs; and expressly directs the receivers to allow them when they ought to be allowed according to *law* not only, but *equity* also. It would seem from the phraseology of the statute, that the legislature had something more in view than the general provisions of the law in regard to set-offs. It gives to the receivers an equitable power, and they are to exercise it according to the justice of the case; and it appears to me that in the present instance the allowance will be just and equitable.

3. It remains to inquire whether the petitioners are entitled to prove their debt for the whole amount, after deducting the nine hundred dollars and the offset of one hundred dollars, and obtain a dividend on the whole, reserving the second draft of one thousand dollars to make up the deficiency; or whether they shall appropriate the draft to the payment of so much of the debt first, and prove for the balance.

On this part of the case I think the decision of the receivers was right, and that the petitioners can be admitted to prove for the balance only. This would be the course under the bankrupt laws. The general principle running through the whole system, is, that equality is equity. All the property, so far as it can be reached and collected, is brought into one common fund, for the benefit of all the creditors; and when a creditor has a security, and insists upon proving, he must deliver up the security for the benefit of the creditors at large: *Exparte Grove*, 1 *Atk.* 104; *Exparte Twogood*, 19 *Ves.* 229. In this last case, the court observed, that if the subject of deposit is the bankrupt's property, it must be sold, and the excess proved as a debt. See also *Cooke's Bank. Law*, 124, 155. The same principle has been applied to cases of insolvency, where the funds are under the control of a court of equity for the benefit of all the creditors. In *Greenwood* v. *Taylor*, *Rus. and Mylne*, 185, (4 *Cond. Ch. Rep.* 381,) a mortgagee petitioned for the sale of his security, and to be permit-

ted to prove the full amount of his debt in a suit for the adminis-
tration of the assets of the deceased mortgagor. It was contended
in that case for the petition, as it was in this, that the mortgagee
has a right to avail himself, concurrently, of all the remedies
which belong to him either in respect of his specific lien on the es-
tate, or as a general creditor of the mortgagor, by virtue of the
covenant for the payment of the mortgage money :—that there
was nothing to prevent him from proving the whole amount of
his demand, in the same manner as he might have sued the
testator if alive, and taken out execution against him for the
whole amount. It was contended, also, that the rule in bank-
ruptcy cases depended on principles peculiar to that system of
equity jurisdiction, and never could be extended beyond it. But
the master of the rolls, in delivering his opinion, said, " The
rule in bankruptcy must be applied here, and the mortgagee can-
not be permitted to prove for the full amount of his debt, but on-
ly for so much as the mortgaged estate will not extend to pay.
This rule is not founded on the peculiar jurisdiction in bank-
ruptcy, but rests upon the general principles of a court of equity
in the administration of assets. The mortgagee who has two
funds, as against the other specialty creditors who have but one
fund, must resort first to the mortgage security, and can claim
against the common fund only what the mortgaged estate is de-
ficient to pay."

If this principle be correctly applied to the administration of
insolvent estates in equity, there is an end of the question. The
security must first be applied to the payment of the claim, and
then the common fund must be resorted to for the balance. The
justice of the rule has been so strongly felt, that it has been re-
cognized and adopted even in a court of law ; as in the case of
*Amory* v. *Francis*, 16. *Mass. Rep.* 308. There a creditor of an
insolvent estate had a mortgage as security for his debt, of less
value than the amount of the debt, and it was held that he could
claim from the commissioners only for the difference between his
debt and the value of the property mortgaged. The chief-justice
says, the rule was adopted in England on account of its reasona-

bleness, and because consistent with the nature of the contract. For the property pledged is in fact security for no more of the debt than its value will amount to, and for all the rest the creditor relies upon the personal credit of his debtor, in the same manner he would for the whole, if no security were taken. The same rule would undoubtedly be applied in England to cases of insolvent estates, where the debtor has deceased, if any mode of settlement and distribution of such insolvent estates existed there.

The argument of the counsel for the petitioners appears to be founded, as to this point, on the idea, that the insolvency of the bank can have no effect upon his rights or remedies—that they have the same remedies against the receivers which they once had against the bank. But can this be so? Does not this very proceeding show that his strict legal remedies have been interfered with by statute, and that the whole assets of the corporation, his debtor, have been placed in the hands of receivers, to be administered for the benefit of all his creditors, under the direction of this court? Suppose the petitioners, instead of coming in to prove their debt under the statute, had proceeded by suit at law against the corporation, as though it were still solvent, and as though no receivers had ever been appointed, and had obtained a judgment and execution;—of what avail would they have been? Surely none. And yet they would have been available against the corporation if no act of insolvency had been committed. The statute has come in and interposed for the benefit of the whole; and it is right that it should be so. Hence it is plain that the receivers do not stand in the same situation as the bank did, nor is the property in their hands subject to the same legal remedies as it was when in the possession of the bank. It is now considered as in court, and under its control—to be administered so as best to subserve the purposes of equity. This court cannot take away, or cancel, or discharge, a just debt, as between these parties; but it can regulate the mode of securing and obtaining it. It can say to a party who has two funds, one separate and the other in common with others, you must first look for

35

payment of your debt to the fund you hold alone, and which other creditors cannot touch; and then, if you are not satisfied, you can resort to the fund in which others have an interest as well as yourself. The debtor, while the property is in his own hands, cannot say this, because he has no right or power to deprive his creditor of any of his legal remedies; and the same may be said of the general creditors. But as soon as the assets are withdrawn from the debtor, and placed in the hands of receivers for the benefit of all, the general creditors acquire rights which the court will protect, by placing all upon a footing of equality as far as possible. This is every day's practice.

It is said, and truly said, that there is a great difference between the two drafts; the one being left as collateral security for a sum certain, and the other for an undefined amount, or for any bills of the Bank of New-Brunswick that were then unredeemed, or that might thereafter be unredeemed. But I am not satisfied with the conclusion drawn by the petitioners, that the first being security for a definite sum, shall, when paid, be considered as satisfying and paying at once the whole of that sum, and yet that the second, when paid, shall be held as paying and satisfying no part of the amount for which it was security, until it be ascertained whether the bank can pay first. Both drafts were delivered as pledges, or collateral security. If, according to the doctrine of the petitioners, the collateral security, ex vi termini, cannot be called on to pay until it is ascertained whether the principal can pay, why not ascertain whether the principal can pay the nine hundred dollars, the specific sum for which the first draft was pledged? Why pay that with the pledge, without first calling on the bank to respond? If in the one case the payment of the draft is considered as payment of the original debt, why is it not to be considered in the other case as payment, so far as it will extend? Is it right to apply a different rule to the two cases, because in the one the pledge will more than pay the debt, and in the other will fall short? I do not perceive the justice of the distinction.

In the original claim of the petitioners as made to the receiv-

ers, they did not consider the first draft as paying off the specific sum of nine hundred dollars for which it was pledged, but insisted on their right to prove for the whole, and receive their dividend for the whole out of the general fund, and then resort to the two drafts for any deficiency. They placed both drafts upon the same footing, as strictly collateral. This ground was abandoned by the counsel as to the first draft, and I think it cannot be supported as to the other.

It appears to me that the State Bank has fallen into an error as to the true construction of the agreement in relation to this last pledge. It was held by the Bank as collateral for any bills of the Bank of New-Brunswick then unredeemed, or which might thereafter be unredeemed. I do not understand this to mean that the draft is collateral to pay any loss that the State Bank might eventually sustain in consequence of the actual inability of the Bank of New-Brunswick to pay after exhausting all their assets—but as collateral for such amount of bills as might be unredeemed at her counter in the usual course of business. This amount was necessarily indefinite at the time; but the State Bank had it in their power to make it definite at any time, by refusing to take any more bills. When the Bank of New-Brunswick failed and ceased redeeming their bills, then the amount became definite of necessity, and from that moment there was a sum certain, for the payment of which the State Bank had a security of one thousand dollars. Both pledges then stand on the same footing—both stand security for definite sums. They must both be applied to the extinguishment of the debts, and it makes no difference that the one will pay the whole and the other a part only. The same rule is applicable to both.

But it is unnecessary to pursue the argument. My opinion is, that the decision of the receivers be reversed as to the offset of one hundred dollars, and confirmed as to the other points.