JOHN CORYELL and others, Executors of John Holcomb, deceased, *v.* THE PRESIDENT and MANAGERS of the NEW HOPE DELAWARE BRIDGE COMPANY.

1. The object of the second section of the "Act to prevent frauds by incorporated companies," was to prevent companies actually insolvent, or whose embarrassments were such as must inevitably lead to insolvency, from doing what it is lawful for an individual debtor to do—make a preference in favor of any creditor. It is the duty of the court to give such a construction and application to the act as to effect the object the legislature had in view.

2. So, where it appeared that several days prior to the execution of a mortgage, the company had refused to redeem its bills, and that the day after its execution the company was hopelessly insolvent. And that after the first act of insolvency, a portion of the directors had been called together for the very purpose of securing the debt due to the particular creditor, in contemplation of the insolvency of the company. The mortgage was held to be utterly null and void as against the creditors, and in direct violation of the letter of the act.

3. A company cannot, on the eve of insolvency, transfer its property to secure certain favorite creditors, and *they* claim the benefit of the proviso of the second section of the act. This proviso was intended to protect a stranger, who, in good faith, and in total ignorance of the situation of the company, makes a purchase of its property, and pays down the consideration money.

4. Where the charter of a company required five managers to constitute a quorum, and there were but four present when a resolution was passed, authorizing the execution of a mortgage, the mortgage is null and void, from the fact that it never received the sanction of the board of directors.

5. By the seventeenth section of the act it is enacted, "That in case any such company, or person or persons whatever, shall think themselves or himself aggrieved by the proceedings or determination of the said receiver or receivers, or trustees in the discharge of their duty, it shall be lawful for the party aggrieved to appeal to the Chancellor, who shall, in a summary way, hear and determine the matter complained of, and make such order touching the same, as shall be equitable and just." The Chancellor may ask the aid of a jury *under the general power of the court.* An issue may be directed if any matter of fact shall render the intervention of a jury necessary. But the effect of the verdict would be very different from that of a jury *under the thirteenth section of the act to prevent frauds by incorporated companies.* Under the last act the verdict would be conclusive, unless set aside by an order of the Supreme Court. If ordered by the Chancellor, under the general power of the court, it would be to inform his conscience, and he would not be bound to respect it unless his judgment approved it.

6. But in such cases, the Chancellor will not ask the intervention of a jury, unless the case is made a very doubtful one by the evidence.

John Holcomb, as a mortgage creditor of the defendants, filed his bill against them, under the act entitled, "An act to prevent frauds by incorporated companies." *Statutes of N. J.* 129. Such proceedings were thereupon had that receivers were appointed. In adjudicating upon the claims of the creditors, the receivers determined that the complainants' mortgage was not entitled to priority. Upon the application of T. J. Coleman, as a creditor, the receivers issued a certificate to him for the sum of twenty-three thousand three hundred and seventy-one dollars. From these proceedings, and determination of the receivers on these several claims, the complainants appealed to the Chancellor.

*W. Halsted* and *O. S. Halsted,* for appellants.

*J. W. Scudder,* for Coleman and others, creditors.

THE CHANCELLOR. The receivers, by their report made to this court, bearing date the 25th day of April, 1853, among other things, reported "that the mortgage to John Holcomb, bearing date the 28th day of December, 1847, to secure the payment of fourteen thousand dollars, is not entitled to priority over other creditors; that the same was made and given after the defendants had stopped payment, or in immediate anticipation of insolvency." They further reported that they issued a certificate to T. J. Coleman, upon a claim presented by him, for the sum of twenty-three thousand three hundred and seventy-one dollars. By virtue of the 17th section of the act entitled, "An act to prevent frauds by incorporated companies," the complainants have appealed from these determinations of the receivers.

First, as to the Holcomb mortgage. By the second section of the act referred to, it is enacted "that whenever any incorporated company shall become insolvent, or shall suspend the ordinary business of the said company, for want of funds to carry on the same, it shall not be lawful for the directors or managers of the said company, or for any officer or agent of the said company, to sell, convey, assign or

transfer any of the estate, effects, choses in action, goods, chattels, rights or credits, lands or tenements of the said company; nor shall it be lawful to make any such sale, conveyance, or assignment, or transfer, in contemplation of the insolvency of any such company, and every such sale, conveyance, assignment or transfer shall be utterly null and void as against creditors."

The object of this section of the act was to prevent companies, actually insolvent, or whose embarrassments were such as must inevitably lead to insolvency, from doing what it is lawful for an individual debtor to do—make a preference in favor of any one or more of its creditors. It is the duty of the court, therefore, to give such a construction and application to the act, as to effect the object the legislature had in view.

The money, which this mortgage was executed to secure, was loaned to the company in 1845. No evidence of the debt was given until the execution of the mortgage, on the 29th of December, 1847. Several days prior to this, the company had refused to redeem its bills through its usual agents in the city of New York.

It was on a bill filed by this mortgagee that the company was declared insolvent. In his bill he alleges that on the 30th day of December, the day after the mortgage was executed, the company was hopelessly insolvent; .and it is proved that after the act of insolvency committed in the city of New York, a portion of the directors were called together, in contemplation of the insolvency of the company, for the very purpose of securing the debt due to this creditor. This mortgage was executed in direct violation of the letter of the act, and is, therefore, utterly null and void as against creditors. If the mortgagee can come in as a creditor of the company, he cannot be admitted as a mortgage creditor; he must come in under his original debt, and in order to do that, must prove it.

But it was argued that the mortgagee is entitled to the benefit of the *proviso* of the second section of the act, which is, " that in case of a *bona fide* purchase, made for a valuable

consideration, before the said company shall have actually suspended the ordinary business of the said company as aforesaid, by any person having no knowledge, information or notice of the insolvency of the said company, or of the sale being made in contemplation of the insolvency of the said company, such purchase shall not be invalidated or impeached."

Admitting that the refusal of the company to redeem its bills in the city of New York was not an actual suspension of the ordinary business of the company, yet the creditor is not entitled to the benefit of the proviso for several reasons.

He was not such a *bona fide* purchaser for a valuable consideration as the act contemplates. A company cannot, on the eve of insolvency, transfer its property to secure certain favorite creditors, and they claim the benefit of this proviso on the ground that they had no knowledge, information or notice of the insolvency of the company. If they could, the object of the act would be defeated. This proviso was intended to protect a stranger, who, in good faith, and in total ignorance of the situation of the company, makes a purchase of its property and pays down the consideration money. But all precedent creditors of the company must stand on the same footing. Such was the design of the act.

Nor did Mr. Holcomb stand in the position of a creditor having no notice of the insolvency of the company. He loaned this money to the bank, through Mr. Coryell, one of its directors. Mr. Coryell acted as his agent through the whole transaction; and while acting as such agent, it was through his instrumentality that the directors were called together to sanction the execution of the mortgage. Mr. Coryell attended to the execution of the mortgage, and it was delivered to him as the agent of Mr. Holcomb. Notice to Coryell was notice to Holcomb.

But again, this mortgage is null and void from the fact that it never received the sanction of the board of directors or managers. By the charter of the company five managers constitute a quorum. There were only four present

when the resolution was passed, authorizing the mortgage, and there is no evidence that any other manager gave his sanction, either formally or otherwise, at any other time.

The counsel further relied upon an agreement alleged to have been made at the time the loan was originally advanced, that it should be secured by a mortgage. If such an agreement would help the complainants, yet the proof in the case falls short of establishing such an agreement.

The report of the receivers, in respect to this mortgage, is erroneous in form. They should have declared the mortgage null and void, and allowed the creditor a certificate for his original debt. I presume they have done this in substance. Let this matter, however, be set right in drawing up the order on this appeal.

The other matter of appeal is as to the certificate which the receivers allowed to T. J. Coleman for twenty-three thousand three hundred and seventy-one dollars.

Coleman presented to the receivers the bank bills of the company, of different denominations, amounting, in all, to twenty-three thousand three hundred and seventy-one dollars, together with his affidavit that he was the *bona fide* owner of the bills. On account of some supposed connection that Coleman had had with the agents of the bank in redeeming the bills, there was a suspicion that he did not come by the bills *bona fide*, and, accordingly, there was an investigation had before the receivers. The complainants, as creditors to a large amount, being deeply interested, appeared before the receivers, by their counsel, in opposition to the claim. The bills being genuine, their production was *prima facie* evidence that the bank was indebted, to the amount of such bills, to the holder. It was perfectly proper that the receivers should impose terms on the holders of bills, that their presentation should be accompanied with an affidavit that they were received in a *bona fide* manner, and that the amount was justly due and owing. Coleman complied with the terms, and he was entitled to receive a certificate, unless his rightful claim to the bills could be impeached. This was

attempted to be done, by the examination of Coleman himself as a witness, and of several other individuals.

Upon carefully examining the evidence, there is something to excite the suspicion that all of these bills did not come *bona fide* into the hands of Coleman, and I was, at first, · disposed to take the verdict of a jury on the question. Further reflection has satisfied me that I would not be justified in putting this expense on the creditors, and that it would not be dealing fairly with Coleman, under all the circumstances. Under the thirteenth section of the act, Coleman, when he laid his claim before the receivers, had a right to demand a trial by jury, and, in like manner, the receivers might have required that his claim should be submitted to a jury. It does not appear that the complainants, or any other of the creditors, requested the receivers to submit the claim to a jury. It is true the receivers would not have been bound to comply with the request, but, in reference to a claim of the magnitude of this one, and about which there was so much dispute, the receivers would have listened with respect to any suggestion of the kind from the other creditors. By common consent, the investigation took place before the receivers. Coleman himself was called upon and underwent a long, searching examination. Several witnesses were examined on behalf of Coleman, and several in opposition to his claim. Counsel appeared on both sides. The receivers unanimously decided in favor of issuing the certificate. There was a suggestion as to the power of the Chancellor to ask the aid of a jury. By the seventeenth section of the act, it is enacted: "That in case any such company, or person or persons whatever, shall think themselves or himself aggrieved by the proceedings or determination of the said receiver or receivers, or trustees, in the discharge of their duty, it shall be lawful for the party aggrieved to appeal to the Chancellor, who shall, in a summary way, hear and determine the matter complained of, and make such order touching the same as shall be equitable and just." This language would seem to imply that the Chancellor must himself decide the matter. And there is

some propriety in this; because it is an *appeal to the Chancellor;* and because the parties before the court had the option of selecting a jury and had declined doing so. In the same seventeenth section, however, and in connection with this right of appeal, the Chancellor, in the execution of the powers and authority under the act, is vested with all the jurisdiction and power which is lawful for the Court of Chancery to exercise in suits depending in that court, and to proceed according to the rules, principles, and practice of that court, excepting when otherwise directed by the act. By the forty-fourth section of the act regulating the practice in the Court of Chancery, (*L. of N. J.* 912,) it is enacted: "That, if any matter of fact shall render the intervention of a jury necessary, then the Court of Chancery is hereby authorized to direct an issue for the trial of the same in the Supreme Court." The effect of the verdict, by virtue of the general power of the court, would be very different from that of a jury under the thirteenth section of the act to prevent frauds by incorporated companies. Under the last act, the verdict would be conclusive, unless set aside by an order of the Supreme Court. If ordered by the Chancellor, under the general power of the court, it would be to inform his conscience, and he would not be bound to respect it, unless his judgment approved it. I think, therefore, that there is nothing in the act to prevent the Chancellor from directing an issue whenever, in his opinion, any matter of fact shall render the intervention of a jury necessary.

But I do not think that, in a case coming before me as this does, I should ask the intervention of a jury, unless the case is made a very doubtful one by the evidence. I do not think this is so. At most, there is some suspicion thrown upon the claim, but nothing more. The proof was with those who opposed the claim, to show it ought not to be allowed; I am not dissatisfied with the conclusion the receivers arrived at. I do no think there was any evidence before them that would have justified them in rejecting the claim.

It is unnecessary for me to determine whether the agree-

ment made between the company and the Columbus Insurance Company was illegal. Admitting it to have been so, still the notes issued under it were good in the hands of *bona fide* holders. The question was, whether Coleman was a *bona fide* holder? He is to be considered such, until the contrary is proved.

The report of the receivers is affirmed, with the modification referred to as to that part of it relating to the Holcomb mortgage. Let the costs of the appeal come out of the general fund.