GEORGE P. BUTLER, complainant,

*v.*

COMMONWEALTH TOBACCO COMPANY, defendant.

[Argued March 10th, 1908.   Decided June 15th, 1908.]

In the case of *State Bank* v. *Receivers of the Bank of New Brunswick, 3 N. J. Eq. (2 Gr. Ch.) 266*, decided in 1835, it was *held* that the "Act to prevent frauds by incorporated companies" was essentiall, a bankrupt act; and it was *further held* that a creditor holding collateral security of an insolvent corporation must apply his securities to the payment of his debt and prove only for the balance.   The essential bankrupt features of this act and its re-enacted provisions have since been repeatedly recognized by our court of chancery, and once by our supreme court. The practice in distributing the assets of an insolvent corporation under this act has been in conformity with the rule in bankruptcy, including the rule respecting the rights of creditors holding collaterals of the insolvent corporation.—*Held*, that the rule thus adopted seems quite as, if not more, equitable than the rule which permits a creditor to prove for his whole debt and retain his collaterals; but without considering and deciding upon the relative merits of the two systems—*Held*, that because this rule in bankruptcy has prevailed, with judicial recognition, for over seventy years, it should be retained.

---

*Mr. Otto T. Hess* and *Mr. Robert H. McCarter,* for Jerome Taylor, receiver of the Commonwealth Tobacco Company, appellant.

*Mr. Maximilian T. Rosenberg* and *Royall Victor,* for the Consolidated National Bank, appellee.

The opinion of the court was delivered by

REED, J.

The Commonwealth Tobacco Company was decreed to be insolvent and a receiver appointed by the court of chancery on October 17th, 1904. Among the claims presented to the receiver was that of the Consolidated National Bank of New York. This bank claimed for the full amount of its indebtedness, amounting to $54,440, as such indebtedness appeared at the date of the insolvency of the tobacco company.

It appeared in the case that the bank held as collateral security for the payment of this debt, warehouse receipts for tobacco in storage. Those receipts were pledged to the bank by the debtor, the tobacco company.

· The learned vice-chancellor held that in view of the rule in the federal courts, and in view of the weight of authority in the state courts, and for the purpose of establishing, as he thought, a harmonious doctrine in the administration of the assets of an insolvent in the state and federal courts; that a rule should be adopted which permitted the creditor to prove for his entire debt as it existed when insolvency was declared, and that the creditor should receive dividends thereon without regard to the amount of collaterals held by him to secure such debt.

The doctrine thus adopted was styled in the opinion, and in the arguments of counsel, the equity rule, as distinguishing it from the opposite rule, which was styled the bankruptcy rule.

It may be conceded that in instances other than strict bankruptcy proceedings, the equity rule for the administration of the assets of an insolvent is supported by the weight of authority in the state courts. It may also be conceded that the same rule has received the recognition of the federal supreme court in the case of *Merrill* v. *National Bank of Jacksonville,* *173 U. S. 131.*

This case holds that the bankruptcy doctrine which requires the holder of collateral securities to exhaust them and credit the proceeds upon his claim, or else requires him to surrender them before he can prove for his entire claim, is not in terms recognized by the United States statute respecting insolvent

national banks, nor in the provision in that statute for a ratable dividend on the claims proved and adjusted. A majority of the court—a majority of one—concluded that the language of the National Banking act did not require the application of the rule in bankruptcy proceedings and adopted the opposite rule as the more equitable.

The comparative merits of the two rules, and the trend of authorities, are exhaustively discussed in the opinion of Mr. Chief-Justice Fuller, writing for the majority, and in the opinions of Mr. Justice White and Mr. Justice Gray, writing for the minority. A careful perusal of these opinions leaves upon the mind the impression that the argument is with the four dissenting judges, and the impression that equality in the distribution is better preserved by the bankruptcy rule than by the so-called chancery method.

One illustration of Mr. Justice White forcibly presents a result which may spring from the application of the chancery rule: "A loans to a bank $5,000 without taking security; B loans to the bank the same amount without taking security; B makes a further loan of $5,000 and takes $5,000 worth of collaterals as security. The bank becomes insolvent and pays fifty per cent. dividend. A gets $2,500 for his $5,000, while B gets $5,000 in dividends upon the $10,000 and $5,000 from his collaterals. B gets his whole debt, although like A he had no security for $5,000 of it."

But whatever may be thought of the comparative merits of the two doctrines, it is quite clear that it cannot be said that the rule adopted in bankrupt proceedings is clearly and conspicuously inequitable. It is the rule which has always obtained in the winding up of insolvent estates by purely bankrupt proceedings. It was a feature of the proceedings in the bankrupt acts of Great Britain as well as the bankrupt acts of the United States. It controls in the distribution of assets under the present Bankrupt act of 1898, section 57*e* and 57*h*. In the case of an insolvent corporation in this state where the assets are distributed in the United States district court, the creditor holding collaterals has to deliver up his security as a condition precedent to proving his whole claim, or else he must apply the value of his

security to his claim, and prove for the balance. If the chancery rule is adopted in this case, it will follow that if the same corporation should be wound up in the court of chancery, the same creditor could prove for his whole claim and retain his securities or enough of them to make him whole. So far as the notion of promoting uniformity of rule should be allowed to control, its influence would be in favor of the preservation of the rule in bankruptcy.

But with a nice balancing of the merits of the two doctrines there appears one consideration, which is controlling in this case. That consideration is that for nearly three-quarters of a century the act under which this insolvent corporation was being wound up has been regarded by the courts of this state as essentially a bankrupt statute, and a bankrupt rule of administration has been applied in the distribution of the assets of such corporations.

In 1835, in the case of *State Bank* v. *Receivers of the Bank of New Brunswick, 3 N. J. Eq. (2 Gr. Ch.) 266*, a receiver of an insolvent corporation was appointed under "An act to prevent frauds by incorporated companies," passed in 1829, the act, which, by re-enactment, is the same as that under which the present proceedings were taken. The insolvent corporation had a claim against the state bank, and the latter held an independent claim against the insolvent corporation. The state bank also held a thousand dollar draft as collateral security for its claim against the insolvent bank. Chancellor Vroom was called upon to deal with two questions—*first,* whether there existed a right to set off the independent claims, and *second,* whether the state bank of New Brunswick was bound to apply to its debt the value of its collaterals and prove only for the balance, or was entitled to prove for the whole amount of its claim regardless of its collateral security. The chancellor (Vroom) held that while the independent debts could not be set off under our statute to enable mutual dealers to discount, yet they could be set off under the act of 1829, because that act partook largely of the character of a bankrupt act, and under the bankrupt system, the set-off was permissible. The chancel-

lor also held that the draft should be appropriated to the payment of so much of the debt due to the state bank of New Brunswick as it would liquidate, and dividends should be paid on the balance.

In 1852 the question of a set-off arose in the case of *Receivers v. Paterson Gaslight Co., 23 N. J. Law (3 Zab.) 283.* This was an action by a receiver against the gaslight company, a debtor of an insolvent corporation, but a debtor which held a claim against the insolvent corporation. The question was whether, in that action at law, the defendant could set off its claim against that of the receiver, and it was held that it could. Chief-Justice Green, in delivering the opinion of the supreme court, remarked: "The act to prevent frauds by incorporated companies, so far as it relates to the estate of insolvent corporations, is, in all its essential elements, a bankrupt law. It leaves the creditor, indeed, the naked remedy of proceeding to judgment against the corporation, stripped at once of its property and the right of exercising its franchises, and thus avoids the constitutional objection of interfering with the obligation of contracts. But like a bankrupt law, it vests the whole property of the corporation, by operation at law, in the hands of assignees, to be distributed among the creditors upon principles of justice and equity."

In 1854, in the case of *Van Wagener et al., Receivers for the People's Bank of Paterson, v. The Paterson Savings Bank et al., 10 N. J. Eq. (2 Stock.) 13,* a question was presented to Chancellor Williamson respecting the effect of certain preferences made by the officers of the insolvent bank just before it closed its doors for business. In distinguishing between those preferences acquired by diligent creditors and those preferences voluntarily proffered by the officers of the bank, the chancellor said: "The object of the act to prevent frauds by incorporated companies is to secure all the creditors of such institutions an equal distribution of its assets. This is the primary object of the statute. Any act done with the view and for the purpose of defeating this object is a fraud upon the act and illegal. The primary object of this act being the same as that

of the bankrupt laws, in giving a construction to it we may properly examine those general principles which have been established by the courts in reference to transactions under those laws. And I may remark here that our courts have always recognized the object and provisions of the act in question and of the bankrupt laws to be essentially the same." The chancellor then proceeded to apply the doctrines of the bankrupt courts in the solution of the question then before him.

In *Spader* v. *Mural Decoration Manufacturing Co., 47 N. J. Eq. (2 Dick.) 18,* Chancellor McGill said: "The receiver is not at liberty to recognize any liability or to make any payment which is not approved by the statute. Such is the view taken out of proceedings under the National Bankrupt act, and it can hardly be questioned that the proceedings now considered partake of the same character."

In *Frost* v. *Barnert, 56 N. J. Eq. (11 Dick.) 290,* Vice-Chancellor Stevens, in passing upon the validity of a mortgage given by the corporation after it became insolvent, said that "The act of 1829, which had become by re-enactment section 63 *et seq.* of the Corporation act, had received a settled construction —that it had been repeatedly held to be in its essential element a bankrupt act."

So it appears that in the decisions of questions arising in the administration of the assets of insolvent corporations, the courts of this state, since the earliest case, have uniformly regarded our statute as essentially a bankrupt act, and applied the doctrines which have controlled in bankruptcy proceedings. The practice of applying collateral securities to the liquidation of a debt against an insolvent corporation, and of proving only for the balance, has been uniform for over seventy years, and hundreds of insolvent corporations have been wound up and their assets distributed in conformity with this rule. Indeed, the influence of the doctrine laid down by Chancellor Vroom in 1835 has been much broader, for it seems to have controlled in the administration of insolvent estates in every form.

Chief-Justice Green, in writing the opinion of this court in the case of *Bell* v. *Fleming, 12 N. J. Eq. (1 Beas.) 490, 491,* which

case involved the rights of a creditor of a person who had made a general assignment, expressed the broad view that it was well settled that such a creditor was entitled to have a mortgage due first satisfied out of the proceeds of the sale of the mortgaged premises, and if that proved insufficient, he was entitled to go in as general creditor for a dividend upon the balance.

Other cases recognizing the same general rule are cited in *Whitlaker* v. *Amwell National Bank, 52 N. J. Eq. (7 Dick.) 400–418.*

It is unnecessary, however, in this case, to consider the general application of the bankrupt rule to all cases of insolvency. It is sufficient to say that the bankrupt character of our statute concerning insolvent corporations recognized so long, vindicates the rule adopted in the earliest case and followed ever since. Even if it should be conceded that the rule adopted in the court below is possibly a more equitable rule than that which has formerly obtained, nevertheless, more injury would result to the jurisprudence of the state by unsettling a practice which has prevailed for nearly three-quarters of a century, practically unchallenged, than by adhering to the rule which has hitherto been regarded as satisfactory and equitable.

We are constrained to the conclusion that the order of the court of chancery should be reversed.

*For affirmance*—None.

*For reversal*—THE CHANCELLOR, CHIEF-JUSTICE, GARRISON, SWAYZE, REED, TRENCHARD, PARKER, VOORHEES, MINTURN, BOGERT, VREDENBURGH, GREEN, GRAY, DILL—14.