The defendant was adjudged by this court to be insolvent, and a receiver was thereupon appointed to liquidate and distribute its assets. One John H.B. Dalrymple presented to the receiver for allowance a claim evidenced by a chattel mortgage, to which more specific reference will presently be made. The successor receiver, upon examination of the claim and inquiry concerning the circumstances accompanying the execution of the mortgage, resolved that the claim ought not to be accorded preferential recognition in the distribution of assets among the creditors. The creditor is aggrieved by the *Page 387 
determination of the receiver; hence this appeal. R.S. 14:14-17;N.J.S.A. 14:14-17.
The pertinent facts are compiled from the depositions and exhibits attached to the very comprehensive and elucidative report submitted by the present receiver.
The corporation had an evanescent existence, although it seems to be experiencing a lingering dissolution. It was organized on March 31st, 1927, and collapsed on October 11th, 1927. The enterprise that the company sought to profitably pursue was the manufacture of monoplanes and accessories. It completed the construction of a plane, but its business was enjoined before any of its products was marketed. Early in September the pecuniary resources of the company had evidently receded to an ebb level. Funds in a sufficient amount were not available with which to discharge the payroll but additional funds were procurable. The company borrowed $3,000 from Mr. Charles T. Rogers, a director, and secured the repayment of the loans by a chattel mortgage dated September 9th, 1927.
Another involvement was overtaking the company. It had contracted to purchase a Wright Whirlwind engine from the Wright Aeronautical Corporation for the sum of $4,000. The company had only $1,500 to devote to the payment of the purchase price. Again it resorted to its capacity to borrow. One Frank De Filipo advanced the balance of $2,500 but insisted that he personally be designated as the vendee in the bill of sale. Accordingly the engine was obtained and installed in a plane, whereupon De Filipo declined to permit the plane to be operated unless he was protected against injury to the engine by a policy of insurance. The requested insurance could not be obtained, and De Filipo caused the engine to be detached from the plane and immediately demanded reimbursement for his outlay plus expenses of $75.
In that exigency Rogers again came to the aid of the company. He conferred with the present appellant, Dalrymple. It was agreed that if Rogers and Dalrymple would furnish the $2,575 for the purpose of enabling the company to acquire the ownership of the engine, the company would secure the advancement by a chattel mortgage lien. Dalrymple successfully *Page 388 
solicited a personal loan of $2,500 from the Peoples National Bank of New Brunswick and drew a check against that credit payable to his own order. At the office of an attorney on September 26th, 1927, he endorsed and delivered the check with $75 in cash to the vice-president of the company, who in turn transmitted it to De Filipo. The company acquired title to the engine from De Filipo and executed and delivered to Rogers and Dalrymple a chattel mortgage encumbering only the engine to secure the payment of the amount advanced. The dealings were essentially contemporaneous. The mortgage was recorded immediately. Rogers thereafter reimbursed Dalrymple for one-half of the $2,575.
Significant events then occurred with extraordinary rapidity. The engine was promptly replaced in the plane. A demonstration of the efficiency of the craft was planned and publicly advertised. Alas, the plane fell — a catastrophe that demolished not only the plane but also the hopes and aspirations of the stockholders and creditors of the company. On September 30th, 1927, the bill was filed by stockholders and creditors pursuant to which the company was determined to be insolvent and forbidden to continue to exercise its corporate franchises. On December 20th, 1927, the receiver was authorized to sell the assets of the corporation free and clear of the alleged encumbrances. The assets including the engine were sold. The claimant and appellant here, Dalrymple, asserts that his advancement to the extent of one-half of the $2,575 expended for the purchase of the engine is now secured by the lien of the chattel mortgage on the proceeds of the sale of the engine.
The present receiver has concluded that the undertaking of the corporation to confer upon the appellant a preferential lien on the engine or on the proceeds derived from its sale was in contravention of our statute (P.L. 1896 p. 298; 2 Comp. Stat. p.1638 § 64), which ordained:
"Whenever any corporation shall become insolvent or shall suspend its ordinary business for want of funds to carry on the same, neither the directors nor any officer or agent of the corporation shall sell, convey, assign or transfer any of its estate, effects, choses in action, goods, chattels, rights or credits, lands or tenements; nor shall they *Page 389 
or either of them make any such sale, conveyance, assignment or transfer in contemplation of insolvency, and every such sale, conveyance, assignment or transfer shall be utterly null and void as against creditors; provided, that a bona fide purchase for a valuable consideration, before the corporation shall have actually suspended its ordinary business, by any person without notice of such insolvency or of the sale being made in contemplation of insolvency, shall not be invalidated or impeached." (Now R.S. 14:14-2; N.J.S.A. 14:14-2.)
The right of an insolvent individual debtor to prefer one creditor to another in the distribution of his property, although at times thought regrettable, was nevertheless recognized both in courts of law and of equity. In considering the activities of corporations, some courts originated the doctrine that the assets of such an organization were impressed with the elements of a trust for the benefit of all creditors, and that the officers should not be permitted in contemplation of the insolvency of the company to divert the assets, or any portion of them, preferentially to certain of the creditors. Other courts resolved that the assets of the corporation did not become a trust fund so long as the corporation continued to pursue its authorized business without any contemplation of its cessation. Another qualification entertained by many authorities was that if the creditor knew or had reasonable cause to believe that the transaction by which he obtained a preference was consummated by the company in contemplation of its insolvency, the preference should be null and void. An exposition of the early cases from which the so-called "trust fund doctrines" evolved may be found in Jones, Treatise on Law of Insolvent and Failing Corporationsch. V. See, also, 13 Am. Jur. 1142 § 1264.
In New Jersey, an insolvent corporation was deemed to have the same dominion over its assets as an insolvent natural person. Neither the insolvency of the company nor, indeed, the institution of a suit to create a receivership was regarded as originating a trust. Gallagher v. Asphalt Company of America,65 N.J. Eq. 258, 270; 55 Atl. Rep. 259; Squire v. PrincetonLighting Co., 72 N.J. Eq. 883; 68 Atl. Rep. 176; Turp v.Dickinson, 100 N.J. Eq. 41; 134 Atl. Rep. 888. *Page 390 
The voluntary practice of insolvent corporations to bestow priorities or preferences upon particular favorite creditors in the distribution of its remaining assets was soon observed to be manifestly detrimental and unjust to other creditors. Such practices, if not actually motivated by fraud, displayed a fraudulent aspect. The enactment of applicable legislation ensued in England and in many of our American states.
In our own state the initial act of the legislature to prohibit insolvent corporations and those anticipating insolvency from transferring their assets is discovered in the statute of 1829.P.L. 1829 p. 58 § 2. Significantly it is entitled "An act to prevent frauds by incorporated companies." A bona fide purchase "made for a valuable consideration, before the said company shall have actually suspended the ordinary business of the said company" and "made by any person having no knowledge, information or notice of the insolvency of the said company or of the sale being made in contemplation of the insolvency of the said company" was not "invalidated or impeached."
The inceptive legislative intent is at once perceptible. The object of the statute was to prevent corporations so circumstanced from fraudulently disposing of their assets to the disadvantage of their creditors. Such preferential transactions by officers of corporations were permissible in the absence of a restraining statute. Wilkinson v. Bauerle, 41 N.J. Eq. 635;7 Atl. Rep. 514; Vail v. Jameson, 41 N.J. Eq. 648;7 Atl. Rep. 520; Savage v. Miller, 56 N.J. Eq. 432; 39 Atl. Rep. 665;Miller v. Gourley, 65 N.J. Eq. 237, 252; 55 Atl. Rep. 1083.
Obviously it was not the object of the act to enable such corporations to victimize an innocent and sinless benefactor even though the fruits of the transaction might soon inure to the benefit of the general creditors. Holcomb's Ex'rs v. ManagersN.H.D.B. Co., 9 N.J. Eq. 457, 460; Receivers of People's Bank v.Paterson Savings Bank, 10 N.J. Eq. 13. Nor was it the purpose of the act to deprive the officers of an incorporated company of the power to conduct the business of the company, by so disposing of or encumbering its property that its insolvency may be avoided or remedied, if such action is pursued in good faith in the *Page 391 
conduct of its business, and if it brought to the company a full and fair consideration acquired coincidently with the transfer of or lien upon its assets. Where in such an expedient is fraud to be detected or inferred? Miller v. Gourley, supra.
The act of 1829 was re-enacted with the same title on April 15th, 1846, and included in the revision then made (page 129). In the revision of 1875 this provision was omitted. AfterMontgomery v. Phillips, 53 N.J. Eq. 203; 31 Atl. Rep. 622,
was decided in Chancery, it again resumed a place in our statutory law in 1895. P.L. 1895 p. 166. The following year it became part of the General Corporations Act, P.L. 1896 p. 298 §64, and has since continued to be in effect (R.S. 14:14-2;N.J.S.A. 14:14-2). It is therefore apparent that the appellant is entitled to the security of his chattel mortgage unless in the factual circumstances the statute is applicable to the transaction in which he engaged.
To place the transaction within or without the class inhibited by the statute, the substance rather than the semblance of the transaction is the directive. Circumstances that are merely suspicious are not logically productive of an inference of fraud.Rice v. Barrington, 75 N.J. Law 806; 70 Atl. Rep. 169;Wolosin v. Iavarone, 112 N.J. Eq. 409; 164 Atl. Rep. 488.
The transaction in which this appellant participated is conspicuously immune from any accusation of the perpetration of fraud upon the creditors of the company. The assets of the company were not thereby reduced in quantity or value. In truth, it was by means of the appellant's loan that the company acquired an additional asset subject to the encumbrance thereon. The company came into possession of that particular asset on the condition that it stand as a security for the amount advanced by the appellant toward its acquisition.
The remarks of Vice-Chancellor Grey in Reed v. HeloisCarbide Specialty Co., 64 N.J. Eq. 231; 53 Atl. Rep. 1057,
although apparently modified somewhat by more recent decisions, seem, nevertheless, to be logical in the instance of a purchase-money mortgage or its equivalent (p. 242): "The prohibition is against transfers of the corporation's property *Page 392 
in contemplation of its insolvency. I do not understand this prohibition to be applicable to conveyances made in good faith by the officers of a corporation at a time when the financial embarrassments of the company are such that its insolvency may be within contemplation, if, as incidental to, and essentially a part of, the conveyance made, a present consideration moves to the company. For instance, if a mortgage be given to secure the payment of money paid in good faith to the company coincidently with the delivery of the mortgage; or a purchase-money mortgage be given to secure the payment of the purchase-money of land conveyed to the company coincidently with the making of the mortgage; or if property be in good faith transferred to the company, and its property, or money, be given in exchange therefor. In all such cases the value of the assets of the company is not materially changed. It is as solvent after such a transaction as it was before."
Here, the enterprise upon which the company had embarked was in an embryonic state during which faith and confidence ordinarily predominate. Financially the company was unstable. The actual
suspension of business as expressed in the statute imports more than a mere failure to meet maturing obligations. It connotes an interruption of ordinary business operations revealed by some objective indications through which the reasonably diligent and innocent creditor is forewarned. For example, in regard to manufacturing enterprises, it is a cessation of manufacture.Hoover Steel Ball Co. v. Schafer Ball Bearing Co., 89 N.J. Eq. 433; 105 Atl. Rep. 500. Creditors or others dealing with a failing debtor are chargeable with knowledge of such facts as they would have ascertained had they properly inquired, but this is so only where some fact or circumstance came to their attention which would induce a reasonable person in like circumstances to investigate. Horton v. Bamford, 79 N.J. Eq. 356; 81 Atl. Rep. 761.
Although adventurous, the company continued its ordinary business of development. It was functioning. It sought and obtained credit. The purchase of an engine was an undertaking in furtherance of its business and certainly not *Page 393 
a measure to hinder, delay or defraud its creditors. There was no plot to vest the appellant with some preferential security for an antecedent debt. The loan was made coincidently with the delivery of the chattel mortgage. The deal was at the moment advantageous to the company. It thereby recaptured its equity in the engine, which otherwise would have been sacrificed. It acquired an additional asset of a value greater than the sum secured by the mortgage. Therefore, fraud is not to be presumed. If, then, there was no fraudulent intent on the part of the officers of the company to make any preferential transfer, and indeed, no fraud practiced upon the creditors, it follows that the appellant was not cognizant of, much less a participant in, a transaction designed to hinder, delay or defraud the existing creditors of the corporation. Subsequent creditors, if any, had constructive notice of the appellant's mortgage.
Moreover, what is meant when we speak of a debtor giving to some creditor a preference? It seems to me that the expression implies a relation of existing creditors having equal or similar rights and equities to have existing assets applied to the payment of the existing debts and a transaction whereby the right of one to demand and obtain satisfaction of his debt from those assets is advanced over those of other creditors. Here, the appellant was not prior to the transaction a creditor of the company, nor was the engine then an asset of the corporation to which its creditors could then resort for payment of the obligations due them.
Often, it has been stated that our act to prevent frauds by incorporated companies in its application to the estate of an insolvent corporation is, in all its essential elements, a bankrupt law. State Bank v. Receivers of Bank of NewBrunswick, 3 N.J. Eq. 266, 270; Receivers of People's Bank v.Paterson Savings Bank, 10 N.J. Eq. 13, 18; Butler v.Commonwealth Tobacco Co., 74 N.J. Eq. 423; 70 Atl. Rep. 319;Active Mortgage Co. v. Apex Building Co., 104 N.J. Eq. 569;146 Atl. Rep. 353; Central-Penn, c., Bank v. New Jersey Fidelity,c., Co., 119 N.J. Eq. 265; 182 Atl. Rep. 262; Prashker v. NewJersey Title Guarantee and Trust Co., 130 N.J. Eq. 391;22 Atl. Rep. 2d 259. *Page 394 
Yet, in the field of bankruptcy, I believe that prior to the Chandler Act it was universally recognized that there was no preference, unless there was a diminution of the estate by reason of the transfer. Tiffany v. Boatman's Savings Institution, 18Wall. 375; 85 U.S. 375; 21 L.Ed. 868; Sawyer v. Turpin,91 U.S. 114; 23 L.Ed. 235; Jaquith v. Alden, 189 U.S. 78; 47 L.Ed. 717;Continental and C.T. and S. Bank v. Chicago Title and TrustCo., 299 U.S. 435; 57 L.Ed. 1268; 4 A Remington on Bankruptcy
(5th ed.) § 1713. See decisions construing Bankruptcy Act of 1898 cited in Collier on Bankruptcy pp. 1276 et seq.
My construction of our statute does not permit me to hold that the advancement and the coincidental execution of the mortgage in the circumstances of the present case constituted an assignment or transfer offensive to the intent, purpose or spirit of our enactment. The distinguishing characteristic of the transaction here scrutinized is that the appellant's chattel mortgage was in purpose and effect a purchase-money mortgage. In principle the present case appropriately may be affiliated to Reed v. HeloisCarbide Specialty Co., supra; Miller v. Gourley, supra; ReginaMusic Box Co. v. Otto Sons, 65 N.J. Eq. 582;56 Atl. Rep. 715; affirmed, 68 N.J. Eq. 801, 802; 64 Atl. Rep. 1134;Flockhart, c., Co. v. Cox Aut. Pipe, c., Co., 95 N.J. Eq. 382; 123 Atl. Rep. 151; affirmed, 96 N.J. Eq. 396;124 Atl. Rep. 925.
Nor would I suppose the statute to be applicable to the transaction if I were convinced by the proofs that the appellant was aware of the embarrassing predicament of the company. The action was not contrived because of the contemplation of insolvency and a desire to effectuate some preferential aftermath. It was born in the expectation that the completion of that type of plane and a public demonstration of its efficiency and general utility would enable the enterprise to eventually prosper. Certainly, the appellant kindled such a hope. Otherwise he would not have extended a personal loan on the security of property which he knew was to be subjected to a somewhat precarious use. In my judgment it was not the intention of the legislature to inhibit such bona fide undertakings by invalidating them in instances *Page 395 
where the efforts to rescue become unsuccessful. It is fantastic to imagine that where the transaction rehabilitates, it is valid; where it fails, it is fraudulent.
I have, however, observed the scarcity of proof concerning the knowledge, if any, of the appellant of the financial condition of the company. I am not prepared to state, nor was the present receiver, that the knowledge of Rogers, the co-mortgagee, is to be legally imputed to the appellant merely by reason of the co-ownership of the mortgage. True, the appellant was a stockholder of the company, but that attachment, of itself, does not generate the presumption that he was informed of the financial condition of the company. Cf. Matthews v. Pope,95 N.J. Eq. 76; 121 Atl. Rep. 746; see scope of affirmance,95 N.J. Eq. 695; 123 Atl. Rep. 358. His interest was not so substantial as to project the inference that the company was in reality a corporate instrumentality of his own. Cf. Matthews v.Pope, supra. The appellant was engaged in the trucking business. He was neither an officer nor director of the corporation. It is not evident that he actively engaged in the business of the company. He undoubtedly conferred with Rogers, and other officers of the company in arranging and consummating the business deal, but what did they tell him about the affairs of the company? In the absence of proof, it is as easy to surmise that they elaborated rather than disparaged the prospects. The observation that he subsequently referred to the company as an "insolvent corporation" (which was then a proper characterization of the company) in affidavits submitted in this cause in resistance to the issuance of receiver's certificates and to the sale of the assets free of encumbrances, does not justify the inference that he previously knew that the company was hopelessly insolvent at the time he contributed his money to its aid. Every general reference in his affidavits to those of Rogers is definitely circumscribed by the explicit words immediately following. Verba posteriora propter certitudinem addita, adpriora quae certitudine indigent, sunt referenda.
I have not ignored the decisions in Cope v. C.B. Walton Co.,77 N.J. Eq. 512; 76 Atl. Rep. 1044; affirmed, 79 N.J. Eq. 165;80 Atl. Rep. 473, in which the creditor knew that *Page 396 
the assignee had previously conveyed all of its property and had exhausted all of its funds and credit; Puritan Corp. v.Gannon, 106 N.J. Eq. 503; 151 Atl. Rep. 283, in which the complainant was fully aware of the insolvency of the mortgagor;Aetna, c., Co. v. International, c., Corp., 117 N.J. Eq. 190; 175 Atl. Rep. 114, in which the transfer was made without consideration to the company, with the knowledge of the transferee; and Schneider v. The Hamilton Trust Co., 105 N.J. Eq. 373; 147 Atl. Rep. 863, where the Trust Company was itself a substantial creditor of the insolvent company and advanced funds to enable the debtor to settle with other creditors at twenty cents on the dollar with the indubitable purpose of eventually obtaining a more advantageous collection of its own claim.
Nor do I endeavor to impugn the general statement of our courts that "a transfer is null and void not only when made in payment of a bona fide corporate debt, but also even when made for abona fide presently moving actual valuable consideration, if the transferee has knowledge or notice that it is made in contemplation of insolvency." Aetna, c., Co. v.International, c., Corp., supra. I have grappled with its adaptation to the circumstances of the present transaction and I have resolved that the statute ought not to be construed with such rigid literality as to exaggerate its manifest object. In the construction of a statute, it is not amiss to ascertain the prevailing climate of the legislative opinion at the time of its enactment and to accord it some deference. Too often has legislation designed to keep us off of Scylla been so interpreted and construed that we have crashed on Charybdis.
In a period of adversity the privilege of borrowing money may be of incalculable value in averting what otherwise would be inevitable financial ruin. Ordinarily, money cannot be borrowed without giving security for its repayment. If the struggle to preserve and continue an enterprise is motivated by an honest and sincere purpose and the emergent transaction in nowise diminishes the assets of the debtor or creates a priority in favor of a creditor over others in the availability of the pre-existing assets of the debtor to pay debts already *Page 397 
existing, the statute, in my judgment, does not invalidate the security coincidently given.
The present receiver apprehends that the execution and delivery of the mortgage is not adequately proved to have been an authorized corporate act. The proof discloses that the mortgage was executed by the vice-president and secretary of the company under the corporate seal. Attached thereto is the conventional affidavit or acknowledgment. Comp. Stat. p. 1541 §§ 21, 22;Sup. (1924) 44-22 (§ 21, now R.S. 46:16-1; N.J.S.A.46:16-1; § 22, now R.S. 46:14-6; N.J.S.A. 46:14-6). It is not disclosed that the execution and delivery of the mortgage was inimical to the judgment of the directors. The acknowledged fact is that the company assumed possession of the engine, installed it in the aeroplane and used it in the exhibition of the craft. The delivery of the mortgage was an indispensable incident in the acquisition of the engine. Ratification is conspicuous.
My conclusion is that the chattel mortgage is a valid security against the proceeds of the sale of the engine to the extent of the sum actually loaned thereon by the appellant.